(No. 29492.—
ELISABETH P. MILLS, Appellant, *vs.* WILLIAM A. SUSANKA, Appellee.

*Opinion filed September 18, 1946.*

440

BRADBURN & DAMMANN, (EDMUND G. PABST, of counsel,) both of Chicago, for appellant.

ODE L. RANKIN, of Chicago, for appellee.

Mr. CHIEF JUSTICE GUNN delivered the opinion of the court:

The plaintiff, Elisabeth P. Mills, brought an equitable action in the circuit court of Cook county against William A. Susanka *et al.* to compel a retransfer to her of fifteen shares of capital stock of Pabst Pharmaceutical Company. The plaintiff alleged in substance that by reason of false representations she transferred to defendant Susanka fifteen shares of such stock, which would give him a control of the stock in the corporation, which he deemed necessary to protect his interests, and upon his promise that he would return the stock as soon as certain litigation involving the plaintiff's father was terminated; that defendant did not abide by these promises, but fraudulently assumed control of the corporation, discharged the plaintiff and others from remunerative employment, and installed himself and his friends in control thereof.

The defendant filed an answer denying he had made any such representations; denying he said he would return the capital stock under any condition, and asserted affirmatively that the transaction was in all respects a *bona fide* purchase and sale of the stock to him for a valuable consideration; and also asserted by way of answer "that the plan, purpose and motive of the plaintiff in making the said sale to this defendant of said 15 shares of stock discloses on her part and on the part of other members of her family, a fraudulent intent to hinder, delay and defraud the creditors of said Edmund F. Pabst which commenced before the said judgment was rendered against said Edmund F. Pabst in the United States District Court and was actively carried on by the concealment of their plans during the pendency of the said creditor's bill based on said judgment and that such active and persistent conduct yet persists and that the plaintiff brings her cause to this court blotched with fraud and with unclean hands and that she is not entitled to any relief in equity."

The apparent basis for the last paragraph in the answer grows out of the following additional facts: In 1931 Edmund F. Pabst produced certain medicines under the name of Pabst Chemical Company, Not Incorporated. Susanka was a creditor and Pabst was also indebted to his son, Adolph, and to his daughters, Mrs. Keith and Mrs. Mills. To discharge these debts he agreed to organize a corporation and transfer all of his assets to it, and issue stock to his creditors, which he thereupon did, the new company being known as Pabst Pharmaceutical Company, giving Susanka 48 per cent of the stock and 52 per cent to the children, Mrs. Mills receiving 100 shares out of a total of 250 shares. In 1932 Pabst was sued by Red Star Laboratories Company for infringing a copyright. In the course of the trial in the latter part of 1936 or the early part of 1937, but before a verdict was rendered, a meeting was held in the place of business of Susanka, at which Mrs. Mills was not present. While there is some dispute as to what took place, the evidence clearly shows that Susanka, together with an employee by the name of Hicks, was the one who was alarmed at the possibility of a judgment being obtained against Edmund F. Pabst, who had no stock interest in the corporation, and was fearful the creditors of Pabst would attempt to subject the stock of his children to payment, and said he would feel better if 15 shares were transferred to him. Attorney Edward G. Berglund was present and assured him he need have no fears upon the ownership of the stock of the corporation, but Susanka persisted in his fears, and finally said he would buy 15 shares and would give an option that they could purchase that, or all of his stock, when they had the money. Attorney Berglund expressly disclaimed in any way acting for Mrs. Mills, and no one else present testified they were acting for her or as her agent. It was understood, or at least suggested, at the time that a policy of insurance in the amount of $15,000 would be taken upon

the life of Susanka, the premiums paid by the corporation, and made payable to the Pabst children. The stated object of this was to enable them to purchase all of Susanka's stock in case anything occurred to him. A short time later 15 shares of stock of Mrs. Mills were transferred to him for a purported consideration of $750. A check for $375 was given, but never paid, and a note for $375 given, and never paid.

A judgment was obtained against Edmund F. Pabst and later a creditor's bill was filed by his creditor against Mrs. Mills *et al.,* in which case the United States District Court specifically found they were the *bona fide* owners of the stock in the Pabst Pharmaceutical Company, and that it was not subject to the debts of their father, and that such children were not indebted in any way to the creditor of their father, Edmund F. Pabst.

From these facts defendant urges there was a transfer by Mrs. Mills to Susanka in violation of section 4 of the Statute of Frauds (Ill. Rev. Stat. 1943, chap. 59, par. 4,) prohibiting fraudulent transfers to hinder, delay or defraud creditors, and hence appellant, by reason of the equitable maxim "he who comes into equity must come with clean hands," should be denied relief. The cause was referred to a master in chancery who found in favor of appellant. According to his report the evidence disclosed that Susanka first desired merely a transfer of stock to make it appear he was an owner of a majority of the stock, but finally agreed to purchase 15 shares for a valuable consideration, and agreed that the shares of stock should be considered worth $50 per share, and that he was to hold the stock until there was no longer danger of the creditor of Edmund F. Pabst acquiring any stock in the company, and that thereafter the stock was to be returned. Mrs. Mills was not present but her father said he would have her make the sale from her stock. After the United States District Court found in appellant's favor on the creditor's

bill Susanka refused to reconvey the shares unless they purchased all of his stock for the sum of $22,000, and stated that the Pabst family had been in the driver's seat for seven years, and that at the present time he was in control.

The master further found there was no consideration paid to Mrs. Mills, and that at the present time she is the actual owner of the stock. There was no finding or comment whatsoever upon the allegation in the answer that appellant's actions constituted fraud such as would bar her relief in a court of equity. The circuit court sustained the report of the master. The Appellate Court for the First District reversed the decree of the circuit court upon the sole ground the transfer of the stock from Mrs. Mills to Susanka constituted a fraud in law, which would bar her relief in a court of equity, notwithstanding it was beneficial to Susanka and without consideration, and was not injurious to any creditor of appellant.

There is no doubt concerning the equitable maxim that "he who comes into a court of equity must come with clean hands," but there has been and is considerable divergence of opinion in its application. In the present suit appellant relies strongly upon the case of *Rossow* v. *Peters;* 277 Ill. 436, and the appellee with like insistence relies upon *Rosenbaum* v. *Huebner,* 277 Ill. 360. In our opinion neither of these cases controls the proper disposition of the case. The *Rossow case* involved the question of whether the conveyance of a homestead by a debtor operated as a fraud upon the creditor of the grantor. We held that since a homestead was not liable to execution for the debt under any circumstances there never was any ground upon which the conveyance could be impeached. On the other hand the *Rosenbaum case* involved the question of a grantor who then had a suit for a large amount of money pending against him, and who transferred his property to a relative to avoid paying a prospective judgment.

In the present case there is no question of legal exemptions, and likewise there is no fact disclosing that appellant owed money to her father's creditor, or was doing any act that it was not her lawful right to do. The maxim assumes the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him all recognition and relief with reference to the subject matter or transaction in question. (Pomeroy, 5th ed. sec. 397.) It does not, however, extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern. When a court of equity is appealed to for relief it will not go outside of the subject matter of the controversy and make its interference depend upon the character and conduct of the moving party, in no way affecting the equitable right which he asserts against the defendant or the relief which he demands. Pomeroy, 5th ed. sec. 399; *Carpenters' Union* v. *Citizens Committee,* 333 Ill. 225; *Barnes* v. *Barnes,* 282 Ill. 593; *Pitzele* v. *Cohn,* 217 Ill. 30; *City of Chicago* v. *Union Stock Yards and Transit Co.* 164 Ill. 224.

In *Carpenters' Union* v. *Citizens Committee,* 333 Ill. 225, we said the rule that the complainant must come into equity with clean hands means he must do equity as respects the defendant's rights in the particular matter of the suit. The rule does not go so far as to prohibit a court of equity from giving its aid to a bad or faithless man or a criminal. The dirt upon plaintiff's hands must be his bad conduct in the transaction complained of. If he is not guilty of inequitable conduct toward the defendant in that transaction his hands are as clean as the court can require.

In *City of Chicago* v. *Union Stock Yards and Transit Co.* 164 Ill. 224, we held the maxim that a party must come into a court of equity with clean hands applies only to the

particular transaction under consideration, as a court will not go outside of the case for the purpose of examining the conduct of the complainant in other matters or questioning his general character for fair dealing. The wrong must have been done to the defendant himself, and must have been in regard to the matter in litigation. The case was followed and approved in *Pitzele* v. *Cohn,* 217 Ill. 30.

One part of the defendant's answer is in irreconcilable conflict with the other part. In the first place he says he purchased the 15 shares in a *bona fide* transaction of purchase and sale for a valuable consideration, and at the same time says there was a fraudulent intent upon the part of the plaintiff or her family to hinder and delay the creditors of Edmund F. Pabst. If there was a *bona fide* sale for a valuable consideration, then section 4 of the statute invoked can have no application. It is contrary to the language of the statute itself, for section 5 of the same act provides the foregoing section shall not affect the title of a purchaser for a valuable consideration unless it shall appear he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering the title void. The defendant makes no claim in his answer that he was attempting to defraud anybody, and in order to make the statute effective the fraudulent intent must be participated in by both the vendor and the vendee. (*Union National Bank* v. *State National Bank,* 168 Ill. 256; *Schroeder* v. *Walsh,* 120 Ill. 403.) There is no allegation of such intent nor any proof of the same.

Under the facts the plaintiff was not present when the arrangement to transfer the stock was made. The proof strongly tends to show the anxiety for the transfer was all upon the part of appellee. There is evidence showing Susanka wanted to be in a position to control if the suit against Pabst, the father of appellant, would endanger the family's stock control. He thought obtaining 15 shares, pending the outcome of the lawsuit, would protect him.

Attorney Berglund said he did not approve of such a scheme, and thereupon appellee said "Well, I can buy 15 shares and give an option to sell it back."

In *Dunbar v. American Telephone and Telegraph Co.* 238 Ill. 456, in discussing a sale made through an agent, and where the defense of illegality was made, the court said: "Again, the appellees insist that the decree of the circuit court cannot be sustained for the reason that Kellogg and the other selling stockholders are *in pari delicto* with the American company. To this we cannot assent. In the first place, the unlawful features in this transaction are largely imported into it by reason of the unlawful purpose of the American company. It was the American company that expected to profit by suppressing competition and the creation of a monopoly in this State. There is no evidence that this unlawful purpose was entertained by Kellogg or the other sellers of this stock. If it be said that DeWolf is *particeps criminis* in this transaction, it may be replied that Kellogg could not and did not attempt to authorize him to enter into a contract against the laws or public policy of the State. Kellogg gave DeWolf a power of attorney to sell his stock if necessary to raise funds to protect his interest and that of the Kellogg Company. This was a perfectly legal and proper thing to do. If DeWolf wrongfully, and in violation of the confidence reposed in him by Kellogg, entered into a secret intrigue with the representatives of the American company for the purpose of violating the laws or public policy of the State of Illinois, it cannot be said, with any show of reason, that Kellogg, who was then in California and in total ignorance of what his agent was doing in Chicago, is equal in guilt with the American company. If wrong at all is to be imputed to Kellogg, it is only in a highly technical sense and limited degree."

Analogy is unnecessary to point out the application of this case to the present state of facts. Plaintiff was not

present when the agreement was made. No proof of an agent to represent her is shown. The sale was a legal and proper exercise of ownership, and fraud will not be presumed unless something more is shown, especially where the conduct of the defendant is strongly suggestive he desired the control for his personal gain and to protect his family in case of his death by providing a means by which his interest in the company could be purchased. Assuming, however, it could be inferred the plaintiff transferred the stock to hinder some one who was not a creditor of herself from collecting from her father, if later a judgment were obtained against him, still the defense of unclean hands would not apply.

By the answer there is an inference that equitably Mrs. Mills might be liable to surrender her stock to her father, in which event Red Star Laboratories Company, after obtaining its judgment, might attempt to reach plaintiff's stock by a creditor's bill. The statute does not reach every such possibility. In *State Bank of Clinton* v. *Barnett,* 250 Ill. 312, which involved a voluntary transfer, within the ban of section 4, we held that in order to constitute presumptive fraud or fraud in law three elements must be proved: (1) there must be a voluntary gift; (2) there must be a then existing or contemplated indebtedness against the donor; and (3) it must appear the donor did not retain sufficient property to pay his indebtedness. In commenting upon this principle that conveyances made without consideration are void as to a pre-existing creditor, the court said: "The principle is thus broadly stated, but it is subject to some qualification,—to this extent, at least, that the debtor retains in his possession property sufficient to discharge all debts existing at the time of making the conveyance alleged to be fraudulent. If this was not permitted, trade of every description would be very much crippled, and instead of there being an active inter-

change of property the whole business of the country would stagnate. No creditor without a lien has any right to complain that his debtor is giving away property to his wife or children, unless such creditor can establish the fact that he has not retained enough to satisfy existing debts."

As disclosing the close connection between voluntary gifts and so-called fraudulent conveyances we said, in *Dimond v. Rogers*, 203 Ill. 464, "In order to obtain relief it was necessary to prove a transfer which in fact or in law was fraudulent as to creditors, or in case of a voluntary gift or conveyance to the husband, that the judgment debtor did not retain enough money or property to pay her debts."

Analysis of the facts, therefore, discloses the averments of the answer were not sufficient to establish fraud as a matter of law. Examination of the facts discloses to our minds no fraud was intended if we assume that appellant adopted the acts of her family carried on in her absence. Appellant did not owe and was not a debtor to Red Star Laboratories Company, and the latter was not a creditor of appellant; nor was the Red Star Laboratories Company such other person having rights similar to a creditor. (*Corry v. Shea,* 144 Wis. 135, 128 N.W. 892, 22 Anno. Cas. 1254.) The answer to the complaint does not pretend to so state, but in the alternative says either appellant or her family had a fraudulent intent to defraud the creditors of Edmund F. Pabst, and the ground of that contention is that the real ownership of the stock was concealed, and this claim is made notwithstanding the United States District Court has decided exactly to the contrary, and no proof is offered to establish otherwise. Moreover, appellee knew all of the facts with respect to the stock, and the transfer of 15 shares to him could not possibly affect the result of preventing Red Star Laboratories Company to recover, if it had in fact belonged to Edmund F.

Pabst. Nor is any good reason pointed out why, if she did have a fraudulent intent, she did not transfer 100 shares instead of 15 shares.

The inference may be fairly drawn from the evidence that the whole transaction was planned by appellee and his agents to place the control of the stock in appellee's hands, so he could manage the company to his own satisfaction, and exclude appellant and her relatives from any part of the control. And this inference is supported by his statement, made a long time afterwards, that he would transfer the stock back when he got good and ready, and that he had been under the domination of the Pabst family for a number of years, and now proposed to exercise some control himself.

Another consideration to be kept in mind is that it is a principle of the widest application that equity will not permit one to rely upon his own wrongful act, as against those affected by it, to support his own asserted legal title, or to defeat a remedy which, except for his misconduct, would not be available; (*Deitrick* v. *Greaney,* 309 U. S. 190, 84 L. ed. 694;) and illegality may not be pleaded when the act complained of is merely collateral to the cause of action sued upon. (*Loughran* v. *Loughran,* 292 U. S. 216, 78 L. ed. 1219.) The decisions are in accord that it is not every reprehensible act that will preclude a litigant in a court of equity from obtaining relief, but, under the principle involved in this maxim, the act must bear an immediate relation to the subject matter of the suit and in some measure affect the equitable relations existing between the parties to the litigation and arising out of the transaction. This is tersely stated in *Langley* v. *Devlin,* 95 Wash. 171, 163 Pac. 395: "The maxim, 'he who comes into equity must come with clean hands,' and 'he who seeks equity must do equity,' means no more than that he who has defrauded his adversary to his injury in the subject matter of the action will not be heard to assert a right in

equity." We think this is a proper exposition of the meaning of the maxim, and no possible injury to appellee by the transaction has been pointed out. Under like circumstances the same court said: "To hold that a court of equity cannot search a contract, that is neither proscribed nor contrary to good morals, because of a fraud affecting a third party, or a collateral right, would lead to the absurd consequence that a defendant in a suit would take a decree equivalent in its legal force to affirmative relief under the plea of corrupt participation." The result of appellee's contention, if upheld, plainly stated, would mean that one may not make a transfer of his own property, though having no debts, if by any possibility the creditor of the real debtor may make a claim successful, or otherwise, to the property transferred. In our opinion such a construction of the statute would greatly limit its beneficial purposes, and in many instances make it a shield for the perpetrator of actual fraud.

We think the Appellate Court for the First District improperly applied the maxim of equity in the present case. However, the part of the answer setting forth that appellee had purchased the stock in good faith for a valuable consideration is not passed upon. The master and circuit court decided this proposition adversely to appellee. Since it is a material issue in the case and depends upon facts, it should be passed upon by the Appellate Court.

The decree of the Appellate Court for the First District holding the plaintiff was barred from bringing suit because of unclean hands is reversed, and the cause remanded to that court with directions to pass upon the question of whether there was a *bona fide* purchase, by appellee from appellant, of the shares of stock involved.

*Reversed and remanded, with directions.*