(No. 30920—

JULIA EVANGELOFF *et al.*, Appellees, *vs.* HENRY EVANGEL-
OFF *et al.*, Appellants.

*Opinion filed March 24, 1949—Rehearing denied May 11, 1949.*

BURROUGHS, BURROUGHS & BLEISCH, and WILLIAM G.
BURROUGHS, both of Edwardsville, for appellants.

HAROLD G. TALLEY, of Alton, and FRED P. SCHUMAN,
of Granite City, for appellees.

Mr. JUSTICE CRAMPTON delivered the opinion of the court:

This is an appeal by George and Henry Evangeloff, defendants, from a decree of the circuit court of Madison County holding an undivided one-third of the fee in two lots in the city of Madison to be in the plaintiff Julia Evangeloff. In addition to the involved freehold the title to the assets and funds of a certain tavern business was declared to be in the plaintiff administrator, Chris Doucleff, and not in the defendants.

The amended complaint, filed in 1947, alleged: Julia Evangeloff is the stepmother of defendants and the widow of Naum Evangeloff, who died intestate in January, 1943. Doucleff was appointed to administer the estate. Naum was the owner of an undivided two-thirds of lots 11 and 12 in a certain subdivision in Madison, and by partition proceedings the lots were sold by the master in chancery to Nick Georgeoff, who purchased and held the lots for and on behalf of Naum. Georgeoff advanced the money to the master to pay for the interest of the other owner, along with some of the court costs and attorneys' fees. No money was ever advanced for, or paid to, Naum for his two-thirds' interest, and Georgeoff never claimed or had more than the naked legal title to the lots, which he held in trust for Naum. On March 10, 1936, Georgeoff, as such trustee, deeded lot 11 to Henry Evangeloff and lot 12 to George Evangeloff, who are sons of Naum; Georgeoff having been fully repaid by Naum for all moneys advanced by Naum at the latter's request. The two deeds placed the title to the lots in the defendants as trustees for Naum, in whom equitable title at all times reposed, and the grantees at no time advanced or paid any consideration for the lots. Naum continued to occupy the property, maintain and run the tavern and rooming house thereon during his lifetime. In the operation of the two business ventures moneys were accumulated in various banks in the names of George and

Henry, which they held as trustees for Naum, and stocks of merchandise in the building at the time of the death of Naum were also held in trust by the two. It is further alleged that the money and the merchandise are assets of Naum's estate, even though claimed by George and Henry to be their property.

A decree was asked which would hold, (1) the two defendants to be trustees holding title to the lots for the heirs-at-law of Naum, and that they convey to Julia Evangeloff an undivided one-third interest therein, (2) that an account be taken of the business ventures carried on by them as such trustees, and that they be compelled to turn over to the administrator all the moneys and personal property found to be held by them as trustees.

The answer to the amended complaint admitted the purchase of the lots by Georgeoff and the subsequent conveyance thereof to the defendants. They averred Georgeoff purchased the lots for himself, did not pay out any moneys in respect thereto for or on behalf of Naum, and defendants deny funds were advanced or paid to him for his two-thirds' interest. They denied the two deeds transferred the lots to them in trust for Naum; on the contrary, they alleged the purchase of the lots outright by them from Georgeoff for valuable considerations paid in installments before the execution and delivery of the deeds. They concluded by stating Georgeoff was fully repaid for all moneys, if any, advanced by him in the acquisition of the lots at the master's sale, and they do not hold any assets or property of the estate whatever, in trust or otherwise. The tavern business was alleged to have been run by George Evangeloff prior to his purchase of lot 12, and he paid rent therefor to Georgeoff who was then the owner.

The cause proceeded to a hearing before the court, and at the end of the first day of trial the defendants asked leave to file additional defenses as an amendment to their amended answer. When objection was made thereto by

the plaintiffs the court reserved ruling thereto, but permitted the defendants to offer testimony in support thereof subject to being stricken in the event leave to file was subsequently denied. This additional pleading stated in the alternative that Naum from several years prior to 1931 and up to the time of his death was insolvent, had a large number of creditors and was without means to pay them. Therefore, if Georgeoff and the defendants afterwards held the lots in trust for Naum all conveyances and transactions in connection therewith were made and done at the request of Naum for the sole and only purpose of hindering or defrauding his creditors. That if the business enterprises carried on in the properties in the names of the defendants were, in fact, the business or occupations of Naum, and if the moneys accumulated therefrom and deposited in the names of defendants or either of them were, in fact, those of Naum (which defendants denied) all was done or conducted at the request of Naum in furtherance of the effort to defeat his creditors. Lastly, Naum in his lifetime and the plaintiffs subsequently were guilty of *laches* in failing to earlier institute appropriate proceedings for the recovery of the property and assets. The court in the decree struck this pleading and all evidence in support.

The decree contained the following findings of fact: Naum having paid to Georgeoff all of the considerations for the purchase of the two lots on March 10, 1936, the latter obeying Naum's directions conveyed lot 11 to Henry and lot 12 to George; the defendants at no time ever paid or advanced any consideration or money for the purchase of the property, and, as a consequence, a resulting trust in the property was created in favor of Naum. It was further found in respect to the lots that neither defendant ever paid a money consideration for their respective lots, and as a gift or advancement from Naum was specifically disclaimed by each in their answer, each held title to a lot as trustee for Naum under such resulting trust. Prior to

and after the conveyances of March 10, 1936, Naum, with the knowledge, consent and acquiescence of defendants occupied and was in physical possession of lots 11 and 12, exercising all control and right of ownership therein, collecting rents, making repairs, paying taxes and insurance, until his death. During the time Naum and his wife, Julia, occupied lot 11 as their home and ran a rooming house thereon, he owned and operated the tavern in the building on lot 12. Upon the death of Naum, his interest in the two lots descended to his two sons and widow subject to the homestead exemption rights of the latter in lot 11, which rights she had never abandoned.

The court also found that defendants wilfully, wrongfully and fraudulently deprived Julia of her rights as the widow of Naum in the lots, and to the rents, income and profits therefrom, and converted all to their use. They intermeddled with and unlawfully retained the personal property, including the tavern business belonging to Naum, together with the income and profits therefrom, converting all to their own use, and continue to do so, thereby depriving the administrator of such; that the testimony of the defendants and each of them with reference to their ownership of the lots, personal property and tavern business involved is contrary to the weight of the evidence offered during the trial. It also found the appointment of a receiver to be necessary to conserve one third of the net profits of the tavern business subsequent to the date of the decree. The adjudging portion of the decree is in accord with the findings of fact.

The defendants contend the evidence does not support the chancellor's findings that a resulting trust existed and that the tavern with all personal property used therewith, including moneys on deposit, did not belong to George Evangeloff. This amounts to a request to this court to evaluate the evidence in their favor.

The plaintiffs, seeking to establish the existence of the trust, had to carry the burden of proof. The product of their labor had to clearly and convincingly prove the payment of the purchase price by the beneficiary so as to leave no doubt whatever. If the evidence advanced can be resolved upon any other theory than a resulting trust the burden has not been successfully carried. (*Houdek* v. *Ehrenberger*, 397 Ill. 62.) The defendants having disclaimed any gift or advancement of the involved real and personal property to them by Naum, the factual question presented is,—where did the purchase money come from,— Naum or the defendants? Where the chancellor saw the witnesses and listened to their testimony, his findings of fact will not be disturbed by this court unless they are manifestly against the weight of the evidence. (*Greer* v. *Carter Oil Co.*, 373 Ill. 168; *Hadley* v. *White*, 367 Ill. 406.) Our evaluation of the evidence must be controlled by this rule.

The evidence pro and con on the question presented a difficult problem to the chancellor, due to its complex and highly conflicting nature. There were few background facts upon which the litigants agreed. That, coupled with the lack of the written evidence on both sides each claimed to have at one time existed, when taken with the failure of what written evidence there was to even tend to establish facts, compelled the chancellor to largely predicate his evaluation of such evidence upon the credibility of the witnesses. This was because the probative force of the various exhibits, one way or the other, rested not so much on their contents alone, but upon the concommitant circumstances brought out by testimony of the parties and their witnesses.

No useful purpose will be served by stating the evidence in detail, and it is of such nature it cannot be given in synopsis without extending this opinion to a length much greater than the issues and points of law involved warrant.

A statement of the generic factual circumstances will suffice. The parties to this litigation and nearly all of the witnesses are of Bulgarian descent, being either immigrants or the first generation thereof. Naum Evangeloff came from Bulgaria and settled in Madison where he engaged in business. In the early 1920's he, with another, acquired title to the two lots, each of them being improved. Lot 11 was on Iowa Street, and lot 12 was on Madison Street, just around the corner from lot 11, which it adjoined. An undivided two-thirds of the lots belonged to Naum and the other one-third to a relative. In the building on lot 12 Naum conducted a saloon in the days prior to the national prohibition era. He was a widower with two small sons, the present defendants, and around 1920 married the plaintiff, Julia, who had two small daughters. The merged families moved into the building on lot 11 where they resided for several years. Then they moved into quarters in the saloon building on lot 12. The families lived together harmoniously until the death of Naum in 1943. The living for the whole family all of these years came from the conduct of the saloon prior to prohibition. During the prohibition era soft drink, restaurant and poolroom ventures were conducted in the saloon quarters. When the prohibition era ended, the saloon was reopened under the nondisguising disguise of a tavern, equipped with slot machines and restaurant facilities of some kind. Aside from the question of title to the different ventures in the building from 1928, there is no question but that it was the usual custom for members of the family to aid in the conduct of the business. This was also true for the time prior to that year. The sons and the stepdaughter, Helen, were the family members who worked therein, waiting on trade, purchasing supplies, and assisting in the very unsystematic fiscal affairs and accounting thereof. From sometime in 1941 until 1945, George served in the armed forces. Henry was away from home long enough to attend

and graduate from a polytechnic college. Ultimately the two stepdaughters of Naum grew to womanhood and married, one to Georgeoff, the purchaser at the master's sale, and the other to Doucleff, the administrator plaintiff herein. Following the death of Naum, a schism developed between the merged families, and the widow, Julia, moved from the home about a year after his death.

The partition suit was instituted by Naum, and the only money ever handled by the master and distributed in that matter was the amount necessary to pay the distributive share of the other owner, costs and attorney fees. Naum gave a sworn receipt for his distributive share to the master, and the mortgage securing the notes for the balance of what the lots sold for was released by the master. It is clear from the record that Naum borrowed the money necessary to make the above payment to the master *via* Georgeoff. That money he borrowed from Georgeoff, the latter lending additional sums at various times later to make an aggregate of about $12,000. This was all paid back to Georgeoff in installments, the last one being just prior to the conveyance of the lots to the defendants on March 10, 1936.

There are in evidence original bank records divulging that during the course of the years subsequent to the end of the prohibition era three banks carried deposits of money in checking accounts and under time certificates which came from the conduct of business ventures which either belonged to Naum or to his son George. The accounts were carried under different names, which were the names of Naum, George, Henry or variations thereof by the use of the Bulgarian equivalents for the English names, including the middle name of Naum. In instances accounts were carried in such manner that Naum could check thereon. According to oral testimony the name styling under which the accounts were carrried did not indicate in whom the actual ownership of a respective account re-

posed. That testimony narrowed the ownership down to either Naum or his son George. The money in those accounts did come from the mentioned business ventures.

Defendants admit they pleaded the alleged fraud for the sole purpose of demonstrating that the plaintiffs did not come into equity with clean hands, *i.e.,* that the sin of fraud charged against Naum descended on his death to bind his widow and heirs-at-law. Then, relying on *Illinois State Trust Co.* v. *Jones,* 351 Ill. 498, they say equity will not intervene to restore to the grantor or his heirs the title to the conveyed property.

The *Jones case* does not control here. This court had occasion in *Mills* v. *Susanka,* 394 Ill. 439, to review prior statements of the court in respect to the equitable maxim of clean hands, and to again affirm them. What was said in the *Mills case* applies here, "The dirt upon plaintiff's hands must be his bad conduct in the transaction complained of. If he is not guilty of inequitable conduct toward the defendant in that transaction his hands are as clean as the court can require. * * * The wrong must have been done to the defendant himself, * * *." Had the alleged fraud been established as a fact, the maxim could not have been applied by the chancellor because no wrong would have been done to defendants by Naum.

*Laches* on the part of Naum in his lifetime, and by the plaintiffs, is alleged as an alternative defense. It is predicated upon the existence of the fraud as a fact. The defendants, not being privileged to urge the application of the maxim of unclean hands, cannot urge *laches.*

The defendants claim the conversations between Naum and Georgeoff concerning the objects and purposes of the conveyances to the defendants were improperly admitted in evidence because they were not made in the presence of the defendants. What Naum told Georgeoff just prior to the conveyance of the lots to defendants is admissible under

*O'Donnell* v. *O'Donnell,* 303 Ill. 31, even though the conveyances were to members of Naum's family, because defendants disclaimed them as gifts or advancements. Under such circumstances, it is competent to prove, by oral declarations of the purchaser made before or at the time of the conveyances, his intention and purpose in taking title in the name of another.

When all matters in reference to the alleged fraud and *laches* were properly disregarded by the chancellor, the remaining question of evidence was whether a resulting trust evolved at the time the lots were conveyed to defendants. The answer depended upon who paid Georgeoff. The chancellor found that Naum made the payment, and we cannot say the finding was against the manifest weight of the evidence. In respect to the tavern, the related ventures, and the income and profits from all, the single question to be answered was,—who owned them, Naum or defendant George? The chancellor found Naum to be the owner, and this finding is not against the manifest weight of the evidence.

The chancellor found the lots descended to Julia and the defendants as the heirs-at-law of Naum subject to her homestead in lot 11. In this court the plaintiffs conceded the lack of homestead in lot 11, but said the finding should apply to lot 12 and requested this court to correct the error under the right given by section 92 of the Civil Practice Act. The decree does not disclose the chancellor erred because he was confused as to what lot his finding and judgment in respect to the homestead right applied. He made no finding nor entered any judgment attaching a homestead right to lot 12. This court does not possess the original jurisdiction to decide whether Julia has a homestead estate in lot 12, and the question is not before us on appeal. She certainly did not have such estate in lot 11. Whatever evidence there is about a homestead right per-

128

tains to lot 12 and not to lot 11. The defendants do not deny the situation arose through error; they simply say Julia has no homestead right in lot 11. Under these circumstances the chancellor should, in the exercise of his original jurisdiction, find and adjudge whether a homestead right in lot 12 belongs to Julia.

The decree of the circuit court of Madison County is affirmed in all respects except as to the matter of homestead right in lot 11 belonging to Julia. That portion of the decree is reversed and the cause is remanded with directions to determine whether Julia has a right of homestead in lot 12, and to adjudge accordingly.

*Affirmed in part and reversed in part
and remanded, with directions.*