**NICE BALL BEARING CO. v. BEARING JOBBERS, Inc. et al. (two cases).**

**Nos. 10737, 10738.**

United States Court of Appeals
Seventh Circuit.

July 20, 1953.

Rehearing Denied Sept. 8, 1953.

Frank F. Fowle, Jr., and W. McNeil Kennedy, Chicago, Ill. (Pope & Ballard, Chicago, Ill., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., of counsel), for Nice Ball Bearing Co.

Floyd E. Thompson and Charles J. O'Laughlin, Chicago, Ill. (Johnston, Thompson, Raymond & Mayer, Chicago, Ill., of counsel), for Bearing Jobbers, Inc.

Before MAJOR, Chief Judge, and FINNEGAN and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

The plaintiff, Nice Ball Bearing Company, brought this action to compel the defendants M. H. Lescure and his wife, Marie M. Lescure, to recognize it as the owner of the capital stock of the defendant Bearing Jobbers, Inc., to have the Lescures issue in its name a new certificate for the stock, and for other appropriate relief. The defendants answered denying ownership of the stock in the plaintiff and averred that the plaintiff is barred by the doctrine of unclean hands from seeking relief in a court of equity. A counterclaim was filed by the defendant M. H. Lescure seeking to recover from the plaintiff a stock certificate previously endorsed by him and delivered to the plaintiff, and to recover dividends on the stock previously paid to the plaintiff.

The cause was referred to a master who took evidence and filed a report including specific findings of fact and conclusions of law. The master held that the plaintiff was entitled to a certificate for the stock of Bearing Jobbers, Inc., and such other relief as might be required to effect the transfer, and that the counterclaim should be dismissed. He recommended that the costs and expenses of the proceeding be borne equally by the plaintiff and by the Lescures. The court approved and confirmed the master's report, adopted his findings of fact and conclusions of law as those of the court, found $7,963.75 was a reasonable amount of compensation for the master's services and that his disbursements of $878.60 were reasonable and necessary, and entered judgment accordingly. From this judgment the defendants appeal. The plaintiff has filed a cross-appeal from that part of the judgment requiring it to pay one-half of the master's fee and disbursements.

The plaintiff company has for many years been engaged in the business of manufacturing and selling antifriction bearings, with its principal place of business in Philadelphia. The defendant M. H. Lescure was first employed by the plaintiff in 1920. Shortly thereafter he became the company's midwestern sales representative in charge of the district sales office in Chicago, a position he held until just after this suit was commenced.

The plaintiff's operations include the manufacture of automotive bearings for use as original equipment and also for replacement purposes. During the decade following 1920, the company did not receive any substantial return from the replacement business. That market was largely controlled by automobile and parts companies which frowned on and discouraged bearing manufacturers which attempted to compete for the replacement business. The plaintiff, however, decided to try to capture a share of this market. Accordingly, it decided to organize a new company, ostensibly an independent one but in reality a wholly owned subsidiary, to function as the sole distributor for its automotive replacement bearings. The plaintiff hoped in this manner to conceal from the automobile and parts manufacturers its replacement operations. It was contemplated that the new company, by obtaining distributorships from other bearing manufacturers, would have a complete line of replacement bearings so that it might service adequately the various jobbers in the field. Therefore, it was considered advisable also to conceal the true ownership of the company from the other bearing manufacturers which were competitors of the plaintiff. Lescure, it was decided, between him and the plaintiff, would manage the affairs of this subsidiary, and he would be represented to the trade as its owner.

To carry into effect this plan, Bearing Jobbers, Inc., was organized and commenced business in 1930, with a total capital of $5,000, all paid in by the plaintiff. Mr. Lescure was made president and Mrs. Lescure secretary and treasurer, and both were named as two of the three corporate directors. The stock was carried on the books of the plaintiff company as an asset under "Investments," but it was issued in the name of Andrew McCown, the plain-

tiff's attorney, who endorsed the certificate and delivered it to the plaintiff, together with his proxy and an assignment of dividends. Lescure undertook the management of the new company in addition to his duties as the plaintiff's midwestern sales representative. Both the plaintiff company and Bearing Jobbers, Inc., occupied the same offices in Chicago, and Lescure's salary and the office expenses were divided between the two companies. The trade was informed that Bearing Jobbers had become the sole distributor of the plaintiff's automotive bearings, and both Lescure and the plaintiff represented that the company was owned by Lescure.

In 1931, about 15 months after this arrangement was inaugurated, Lescure apparently became embarrassed in representing that he owned Bearing Jobbers when it was in realty a wholly owned subsidiary of the plaintiff and the stock was not even in his name. Therefore, it was decided that the stock should be taken out of the name of Mr. McCown and placed in Lescure's name and that the plaintiff should change its books to show the $5,000 it had paid for Bearing Jobbers stock as an account receivable against Lescure. Accordingly, the old stock certificate was cancelled and a new one was issued in Lescure's name. This he assigned in blank and sent to the plaintiff, together with his proxy and an assignment of all dividends on the stock. The plaintiff and Lescure then executed the following written instrument:

"Agreement made and concluded this 7th day of August A.D. 1931, between Nice Ball Bearing Company, a corporation of Pennsylvania, hereinafter called "Nice" and M. H. Lescure, of Chicago, Illinois, hereinafter called "Lescure".

"Nice owns One Thousand (1000) shares of the capital stock of Bearing Jobbers, Inc., a corporation of Delaware, such stock being the entire authorized issue * * *.

\* \* \* \* \* \*

"1. Nice agrees to sell and Lescure agrees to purchase said stock for Five Thousand Dollars ($5,000.) cash, subject, however, to the conditions hereinafter contained.

"2. Lescure shall pay such purchase price to Nice between January 1st and January 10th, 1933.

"3. Upon the execution hereof, Nice shall deliver to Lescure a certificate for said stock in the name of Lescure, which stock shall forthwith be registered on the stock transfer books of Bearing Jobbers, Inc. in Lescure's name and Lescure hereby acknowledges receipt of said certificate.

"As a part of the transaction hereinabove recited, Lescure has endorsed said stock certificate in blank and has delivered the same unto Nice, together with an assignment to Nice of the dividends now due or to become due on said stock, as security for the covenants herein required to be performed by Lescure, receipt of which stock and assignment Nice hereby acknowledges.

"4. It is expressly agreed that either party hereto may terminate this agreement by written notice * * * at any time prior to January 10, 1933 * * *.

"5. This agreement shall be terminated upon the death of Lescure, whereupon, Nice may forthwith transfer the said stock to whomsoever it may determine.

\* \* \* \* \* \* "

The $5,000 investment in Bearing Jobbers stock was then closed off the plaintiff's books, and, in lieu thereof, an account receivable against Lescure in the same amount was entered. The account was carried in this manner until Mechling came to the plaintiff company in 1934, when the stock was again placed back on plaintiff's books as an investment at a nominal amount. From then on it continued to be carried as an investment.

This instrument, throughout nearly twenty years of intercourse between Lescure and the plaintiff, was never again referred to or discussed until just before this suit was filed. The Bearing Jobbers stock remained in Lescure's name, and the plaintiff retained possession of the endorsed stock certificate and the Bearing Jobbers stock records. Beginning in 1940 and regularly thereafter, Lescure caused dividends on the stock to be paid to the plaintiff, amounting in all to

$72,000. Lescure did not tender the $5,000 purchase price within the dates specified in the instrument or at any other time, until shortly before this action was commenced, and the plaintiff never demanded payment.

In 1949 the plaintiff, seeing a Dun & Bradstreet report indicating that Lescure was the owner of Bearing Jobbers, determined that the stock of that company should be transferred to it of record. The plaintiff, therefore, cancelled the one outstanding certificate which had been issued in the name of Lescure and which it held, made out a new certificate in its name, and sent the certificate to Lescure for him and his wife to execute as officers of Bearing Jobbers. The plaintiff also made proper notations in the stock book of Bearing Jobbers showing this transaction. Lescure refused to execute the new certificate placing the stock in the name of the plaintiff and the plaintiff thereupon instituted this action.

The defendants advance the theory that the instrument executed in August 1931 shows a completed sale of the stock to Lescure and that the assignment in blank and the delivery of the certificate to the plaintiff constituted a pledge of the shares as security for Lescure's promise to pay the purchase price. The defendants argue, therefore, that in accordance with accepted rules of the law of pledges, since the plaintiff never foreclosed Lescure's right to redeem the pledged property, the ownership of the stock remained in Lescure.

The master rejected the theory that this case is governed by the law of pledges. His report contains a narration of the circumstances leading to the incorporation of Bearing Jobbers and the subsequent stock transaction in 1931, and of evidence indicating the true nature of Lescure's relationship with the plaintiff and with Bearing Jobbers during the succeeding twenty year period. In his conclusion the master expressed a serious doubt on the question of whether the agreement of August 7, 1931, was in reality a valid contract, and stated that throughout the period Lescure "always recognized plaintiff as the owner and plaintiff always controlled the business and affairs and employment agreements entered into by Bearing Jobbers with Lescure; in

fact, there never has been a relation of buyer and seller and the relationship has always been that the Lescures were employees of plaintiff and that plaintiff was the owner of Bearing Jobbers." In his conclusion the master further stated that: "In any event the agreement of August 7, 1931, was an executory contract which expired by its terms on January 10, 1933, when Lescure failed to pay the purchase price. Thereafter, as appears from the foregoing, the course of conduct was that the contract was considered as abandoned by both parties and thereafter Lescure always treated the Nice Company as the owner of said shares and Nice Company exercised all the rights of ownership."

We think that both the plaintiff and the defendants in their briefs in this court have over-simplified the questions presented by this case. The plaintiffs would have us decide that the document which the parties executed as of August 7, 1931, and their actions in connection therewith, constituted at most an executory contract between the parties by which the plaintiff at most granted the defendant Lescure an option to buy the stock of Bearing Jobbers, the option being expressly conditioned on, first, Lescure's paying $5,000 for the stock between January 1st and January 10th, 1933, second, on Nice not giving Lescure written notice of its termination of the "agreement" prior to January 10, 1933, and, third, on Lescure's continuing to live until January 10, 1933. The defendants, on the other hand, insist that this instrument which the parties executed was an unambiguous, executed contract of sale by which Nice sold and delivered the stock to Lescure, taking back as security for the payment of the purchase price an assignment in blank of the stock certificate which had been issued in the name of Lescure and a written assignment of the dividends then due, or to become due, on said stock.

■ On the theory that the written instrument constituted an unambiguous, written contract between the parties, the defendants now insist that much of the evidence admitted in the trial was irrelevant and immaterial as showing the conduct and the intent of the parties in an attempt to vary the

terms and conditions of the written contract. We readily agree with the defendants on their contention that where a contract is clear and without ambiguity the intention is to be determined from the language of the contract and that the terms of the contract cannot be changed by evidence of extrinsic language or conduct of the parties.

While we cannot agree that the "contract" here in question, when considered as a whole, was free from ambiguity, we think that in this case the real issue which these parties tried below was not a question of the terms of the contract but rather the question of whether there was any valid written contract made between Nice and Lescure. In the trial of the case the attorneys for the defendants understood this to be the real issue. Mr. Kenny, one of the attorneys representing the defendants in the trial, in explaining the grounds for his objection to the admission of certain evidence, said, page 85 of the printed record:

"On the ground there is no relevancy shown to this letter in regards to the issue, or the primary issue in this case, which is that contract which is admitted by both sides, which states the basis of the understanding between both parties. Is that a valid, bona fide agreement, or is it not?"

And again on page 86 of the record Mr. Kenny said:

" * * * the issue which is, is that agreement bona fide or is it not bona fide. If it is not bona fide, then I would like that brought out, because then our further contention is that plaintiff is in here with unclean hands."

While the law is clear that parties may not vary the terms of a bona fide, unambiguous, written contract, it is equally clear that they can show by extrinsic evidence that, while the parties had executed an instrument which on its face purported to be a written contract, they did not, at the time of its execution, intend it to be a contract, and that it, therefore, was not a contract, and placed neither party under any legal obligation.

In Southern Street-Railway Advertising Co. of Baltimore v. Metropole Shoe Mfg. Co., Court of Appeals of Maryland, 91 Md. 61, 46 A. 513, the defendant made a verbal contract with the plaintiff's agent to purchase a certain amount of advertising space, but at the same time signed a written contract to buy much more space. Both parties understood that the written contract was executed only for the purpose of being used by the plaintiff to induce others to purchase advertising space. In an action seeking to enforce the written contract, the court permitted the introduction of parol evidence to show that the parties did not intend that the written instrument was to be considered as their contract. The Maryland Court of Appeals, in affirming the ruling of the trial court, said, page 514:

"It is earnestly insisted upon the part of the appellee that this rule [not permitting parol evidence to vary or contradict the terms of a written contract] has no application to this case, because the testimony was offered, not for the purpose of varying or contradicting the contract, but to show that the parties to the writing never intended it to be a contract, or as the binding record of a contract."

The court held the evidence admissible for that purpose. As said in Bennett v. Northwestern Nat. Ins. Co., 84 Cal.App. 130, 257 P. 586, 588:

"The law does not make a contract when the parties intended none * * *."

In Davis v. Davis, 119 Conn. 194, 175 A. 574, this rule was even applied in the case of a marriage contract. There two persons, on a dare, had procured a wedding license and had had a justice of the peace perform the wedding ceremony, neither party intending thereby to enter into the marriage status. The Supreme Court of Errors of Connecticut held that the trial court should have granted a petition to annul the marriage, saying, 175 A. at page 577:

"It is an accepted principle that, where two parties go through the form of entering into a contract, both understanding that there is no intent thereby to incur legal obligations, no contract is in fact created."

As the court aptly said in National Bank of Kentucky v. Louisville Trust Co., 6 Cir., 67 F.2d 97, 102:

"No one has ever supposed that the actor who, as part of his lines in a play, went through the form of making a contract by patrol, incurred any contractual obligation thereby. The form is there but intent is lacking."

See also New Haven Tile & Floor Covering Co. v. Roman, 137 Conn. 462, 78 A.2d 336, 337; A. D. Birely & Sons v. Dodson, 107 Md. 229, 68 A. 488, 489.

That this is the general accepted rule of law as to such transactions which purport to be contracts but are not so intended by the parties is shown in 1 Page, Contracts, 2nd Edition, § 82, page 107: "Offers in outward form are often made but the real understanding of the offeror and of the offeree is that no contract is to be entered into by such transaction." The text proceeds to say that where the parties thereto intend such offer and acceptance "to be a mere form and never to take effect under any circumstances," then, "Such a simulated contract has no legal effect. It creates no rights and imposes no duties." See also 17 C.J.S., Contracts, § 32, page 362. The courts of Illinois have recognized this as being the true rule. Eckhart v. United States Fidelity & Guaranty Co., 280 Ill.App. 461, 470; Higgins v. Lessig, 49 Ill.App. 459.

■ From a careful and thorough consideration of all of the evidence in this case we are convinced that no reasonable person could conclude from the evidence that the plaintiff and Lescure intended the instrument dated August 7, 1931, to be a contract between them. The defendant Lescure admits that prior to that date the plaintiff was the sole owner of the stock of Bearing Jobbers. Admittedly, up to that time both Lescure and the plaintiff had made representations to the trade and to the public that Lescure was the owner of the business. The evidence shows clearly that prior to the execution of this instrument Lescure was embarrassed by and objected to holding himself out as the owner when all of the stock of Bearing Jobbers stood in the name of Mr. McCown, the plaintiff's attorney,

as nominee or trustee for the plaintiff. It is clear that the stock was transferred from the name of McCown to the name of Lescure only to ease Lescure's embarrassment in representing to the public that he owned the business when the stock was not even shown in his name on the stock books of Bearing Jobbers and when the books of the plaintiff carried the stock as an investment of the plaintiff.

The plan for transferring the stock into Lescure's name and for changing the plaintiff's books accordingly, after being worked out by McCown, was submitted to Lescure with a letter from Mr. B. G. Nice, plaintiff's president, who had a conference with Lescure on the subject of obtaining these two objectives. In the letter Nice explained to Lescure that the purpose of the agreement was to put the stock in Lescure's name and to take the investment item off plaintiff's books so that he, Lescure, could say that he owned the stock. Answering Nice's letter, Lescure said that the plan was satisfactory to him and that the transfer of the stock into his name would "cover the situation very nicely." In his letter Lescure also said that he was "not so much concerned as to the method used in making this transfer, but did feel that * * * it should be in my name and *appear* as though the Company was *my own*. Otherwise we would be apt to jeopardize our position with the Bearing Companies * * *." (Our emphasis.)

After this agreement was executed between the parties and the stock was reissued in the name of Lescure, the plaintiff and the defendants continued to operate with each other and with the public in exactly the same manner as they had operated prior to August 7, 1931.

Bearing Jobbers was designed primarily as the Nice Company's selling organization in its particular field, and its success or failure as such was largely Lescure's responsibility. Therefore, he was anxious to promote its growth, and necessarily he possessed a considerable amount of managerial discretion. But throughout the twenty year period here involved Lescure acted at the direction of the plaintiff in such manner and to such an extent as un-

deniably to have recognized it as the parent company. This is apparent, first, from a number of miscellaneous events which occurred throughout the years.

For example, at the plaintiff's request and contrary to the wishes of Lescure, Bearing Jobbers in 1934 started carrying an insurance policy on Lescure's life. The premiums were of a rather sizable amount and, so Lescure thought, constituted a financial burden on the young company. Several times he asked the plaintiff if the size of the policy could not be reduced so as to lower the annual premiums, and each time this was refused. On at least one occasion the Nice Company obtained a loan against this policy, and in 1938 Lescure reported that the loan, "which was as you know incurred by the parent company," could be repaid without seriously affecting the cash position of Bearing Jobbers, and he asked the plaintiff's permission to do so. The same insurance policy was later the subject of an agreement with the plaintiff, signed by Lescure, which recited in the body that Bearing Jobbers "is a wholly owned subsidiary" of the Nice Company.

Lescure was required by the plaintiff to submit monthly statements of Bearing Jobbers' operations. On occasion he was delinquent in this regard, and would then be urged to get the statements to the Nice Company in time for the inspection of the directors at their monthly meetings. Lescure was also required to furnish the plaintiff with copies of Bearing Jobbers' tax returns. He had to submit for approval from time to time the proposed valuation of Bearing Jobbers stock for capital stock tax purposes, and he expressed his willingness to adopt the plaintiff's suggestions in that regard. In 1944, the plaintiff called Lescure's attention to the fact that each year he should file an information return indicating to the Bureau of Internal Revenue that he was not the owner of any Bearing Jobbers stock. And in the same year Lescure asked authorization from the plaintiff to purchase tax anticipation notes for use in paying Bearing Jobbers' federal income taxes.

The plaintiff at times instructed Lescure with respect to certain bookkeeping and auditing procedures to be followed, and on one occasion required him to secure approval of the parent company before contracting for printing or catalogues.

In 1947 Lescure wrote to the plaintiff regarding his attempt to find new quarters for Bearing Jobbers. Quoting the terms under which he could obtain suitable facilities, he stated, "I know this sounds like a great deal of money to you," and he asked if he might negotiate a lease on that basis, or if he could have "a free hand to go ahead knowing that I shall do my best to make a satisfactory arrangement at the lowest possible expense."

Lescure never participated in Bearing Jobbers stockholders' meetings, which were always arranged by the plaintiff. He invariably named a proxy, suggested by the plaintiff, to vote the stock at these meetings as instructed by the plaintiff. Lescure held directors' meetings at the request and in accordance with instructions of the plaintiff, generally to carry out some particular purpose which the plaintiff had in mind. For example, Lescure was requested by the plaintiff to hold a board meeting for the purpose of electing as vice president of Bearing Jobbers a person whom the plaintiff selected.

In numerous letters between the plaintiff and Lescure during the period involved, the nature of Bearing Jobbers as a subsidiary and Lescure's employee status is clearly shown. Frequently, Lescure made specific reference to the "parent" company, and in one instance he commented that he had "exploited" his name as sole owner of Bearing Jobbers. He once wrote to an officer of the Nice Company that he was "put out" to learn that an official of another bearing company had referred to Bearing Jobbers as a subsidiary of Nice, since it indicated that the personnel of that company "had knowledge of the existing setup."

It is significant as an indication of the true ownership of the stock that the plaintiff always dictated the amount of salary which Bearing Jobbers paid to Lescure. This was integrated with the compensation paid Lescure by the Nice Company for services in his capacity as its midwestern sales representative. In the beginning these arrangements were on an informal basis. In

1935 a two year written agreement was entered into which provided that Bearing Jobbers would pay Lescure a certain salary plus 10 per cent of its net profits before taxes. This document was signed by Lescure and by B. F. Mechling, executive vice president of the Nice Company, whose signature appears immediately below the statement, "Approved as of the date of this agreement, for the Nice Ball Bearing Company, Sole Stockholder of Bearing Jobbers, Inc."

In 1937 this contract of employment was renewed for one year upon the same terms. The next year a memorandum of agreement was executed again renewing the contract and increasing Lescure's percentage of Bearing Jobbers profits to 15 per cent. This memorandum was signed by Lescure personally and as president of Bearing Jobbers and then by Mechling, again under the statement, "Approved for the Nice Ball Bearing Company, Sole Stockholder of Bearing Jobbers, Inc." Lescure wrote to the plaintiff that, "Your kind expressions in regards to our work and the voluntary increase extended is sincerely appreciated, and you may count upon us to put forth the same conscientious effort during the new term to make both setups more profitable to the company." This agreement was renewed in 1939. In 1940 a new contract of employment was entered into between Lescure and Bearing Jobbers, which granted Lescure an increase in salary. This contract was signed by Lescure, and again it bore the approval of the plaintiff as "Sole Stockholder of Bearing Jobbers, Inc." From all that appears, this was assumed by both the Nice Company and Lescure to have been the fact.

Lescure had opportunity to acquire actual ownership of Bearing Jobbers but refused to do so. In 1934 the Nice Company's sales manager wrote to Lescure, relating that he had been criticized severely by Mechling for his policies regarding Bearing Jobbers, and that according to Mechling, "Every phase of B. J. was 'wrong,' and the idea was to fold it up." He then stated, "At one time I nearly 'phoned you to suggest that you offer $10,000 for it, lock, stock and barrel. I really believe such an offer would buy the Company's stock ($5,000) and the $12,000 note, leaving only current invoices to be paid." Lescure replied to this letter, but no reference was made to the suggestion that he might be able to buy the Bearing Jobbers stock. He did say that it was difficult to submit himself to the supervision of Mechling, but that he had no choice since he had "exploited" his name as the owner of Bearing Jobbers.

Again in 1935, when the Nice Company was engaged in a voluntary reorganization, it asked Lescure to surrender his stock in the company and offered in exchange the stock of Bearing Jobbers. The plaintiff formally proposed "To give Lescure an option to exchange all of his stock in the Nice Ball Bearing Company for all of the Capital Stock in Bearing Jobbers, Inc." Lescure refused this offer, indicating that he considered his Nice stock to be more valuable than the Bearing Jobbers stock, and also that he wanted Nice to continue to own Bearing Jobbers because he was afraid that if he were the owner the plaintiff might some time refuse to sell him bearings.

In 1944 an officer of the plaintiff company again discussed with Lescure the possibility of his buying the Bearing Jobbers stock. He was still not interested in doing so.

To none of these offers did Lescure make any suggestion as to his having already bought the stock.

Perhaps the most significant evidence that the Nice Company was recognized by everyone concerned as the owner of Bearing Jobbers is the fact that at the plaintiff's request, Lescure caused dividends on the stock to be paid Nice. In 1940, B. G. Nice, the president of the company, wrote to Lescure stating that the company needed cash and requesting that Bearing Jobbers pay a dividend. Nice told Lescure when to hold the necessary directors' meeting and outlined the steps to be followed in declaring and paying the dividend. Lescure replied that, "it gives us great pleasure to assist at least in a small measure by declaring a dividend of $5.00 per share, namely, $5,000.00 payable to the parent company * * *."

In June 1942, in accordance with the plaintiff's directions, Lescure caused Bearing Jobbers to declare a dividend of $500 for each month, to be retroactive to January

1942, and continuing thereafter from month to month until the further action of the board. Actually, these regular monthly dividends continued until March of 1950.

In 1946 the plaintiff wrote to Lescure saying that for the present it had decided not to require the payment of a larger dividend. The letter stated further that the accounting firm of Ernst & Ernst had advised the plaintiff that Bearing Jobbers was not vulnerable to the Internal Revenue Code Section 102 tax on undistributed earnings "because of the fact that Bearing Jobbers is wholly owned by the Nice Ball Bearing Company." But in 1947 the plaintiff requested Lescure to cause an extra dividend of $6,000 to be paid and this was done. The plaintiff again, in 1948 and 1949, requested an additional dividend in the amount of $6,000 and each time Lescure complied.

In total, beginning with the plaintiff's initial request in 1940, Lescure caused Bearing Jobbers to declare and pay to the Nice Company dividends in the amount of $72,000. The plaintiff's income tax returns have referred to Bearing Jobbers as a wholly owned subsidiary and have included, as a part of gross income, these dividends. Lescure has never received any dividends from Bearing Jobbers and has never paid income tax on any dividends on this stock.

In the trial before the master Lescure's excuse for paying all of these dividends to plaintiff was that he thought he was obligated to do so by the written assignment of the dividends he had made to plaintiff. Lescure was a man of extensive business experience. He now says that he thought he owned the stock but that it was pledged to plaintiff as security for the payment of the $5,000 purchase price for the stock. It is inconceivable that Lescure, with his business experience, would pay $72,000 in dividends in payment of a $5,000 debt.

Even when the plaintiff first requested, in 1949, that a new Bearing Jobbers stock certificate be issued in the name of the Nice Company, Lescure made no objection to this on the ground that he was the actual owner of the stock. He first claimed that he feared a possible tax liability arising from the proposed transfer, and was promptly told by the accountants for Nice and Bearing Jobbers that: "Inasmuch as you actually had no right, title, or interest in the stock, although the shares appeared in your name, it is our opinion that the change on the stock record, which will result in showing the real owner Nice Ball Bearing Co. as the owner of record, will not involve any tax consequence." Lescure also objected because he could not "see the wisdom of changing the present setup which apparently has been satisfactory for nearly twenty years." Lescure stated that "the Nice Ball Bearing Company is adequately protected by having in their possession the stock certificate * * *," and said further: "Please understand I have no designs upon this company except to faithfully continue to promote its welfare * * *."

In subsequent correspondence with the plaintiff, Lescure reiterated his argument that it would be unwise to make public the arrangement which had prevailed for nearly twenty years. He thought the reasoning prevalent in 1930 "under which the entire setup was guarded with deep secrecy, is just as sound today as it was then * * *." Apparently Lescure was fearful of injury to his prestige and reputation if it became known generally that he had never in fact been the owner of Bearing Jobbers. For he insisted that, "attempting to correct the situation at this late date * * * would undoubtedly destroy the confidence which our many Distributors have in B. J., Inc., and in me and at the same time ruin the reputation I enjoy with every concern in the Bearing Industry thus precluding any possibility of obtaining their lines *in the event I would ever elect to set up my own company as a Distributor.*" (Our emphasis.) Lescure said that after having acted as "front man" for twenty years during which Bearing Jobbers had grown to its present position, he could not readily agree to repudiate the "understanding." And he stated that under such circumstances he did not wish to be placed in such a position as might irreparably injure his reputation throughout the bearing industry. Therefore, he refused to execute the assignment of the stock to the Nice Company.

It is true that throughout the hearing before the master Lescure insisted that,

although he was at times somewhat confused, he thought he had actually owned Bearing Jobbers since August 7, 1931. However, in view of his consistent and unequivocal conduct and actions during the twenty year period, no reasonable person could believe Lescure's testimony or accept his theory that since that date he had been the actual owner of the Bearing Jobbers stock.

Since we find and hold as a matter of law that the "contract" of August 7, 1931, was a sham and was never intended by the parties to be their contract, it is unnecessary for us to consider the other questions which the parties have raised concerning the contract's interpretation or its performance. The stock of Bearing Jobbers has at all times heretofore, and does now, belong to the plaintiff and Lescure has no interest therein.

Finally, the defendants contend that even though the instrument which Lescure and the plaintiff executed August 7, 1931, be considered a sham and that it be found that the parties never intended it as a contract between them, that, since the execution of the instrument was one step in the concealment from the trade and from the public of the fact that the plaintiff was the owner of Bearing Jobbers, the conduct of the plaintiff in so aiding in this concealment constituted such fraudulent conduct as to prevent it from now coming into a court of equity and demanding recognition of its ownership. With this contention we cannot agree.

The master found that the evidence failed to show concealment on the part of the plaintiff beyond 1934, or how widespread the effect, if any, of such concealment was; that there was evidence that in 1935 the creditor banks and other outsiders knew the true situation; that in 1947 Mr. Carlton, the president of the plaintiff, told a competitor that the Nice Company owned Bearing Jobbers; and that it was well known throughout the industry that Lescure was an employee of the plaintiff and that there was a close connection between the plaintiff and Bearing Jobbers. The master found further that the evidence failed to disclose that any of the competitors was vitally interested in the ownership of Bearing Jobbers or that any competitor or purchaser or the public had suffered any harm as a result of the early misrepresentation as to its ownership. It is also to be remembered that when, in 1949, the plaintiff sought to have the record ownership of the stock changed to show the true ownership and to have Dun & Bradstreet informed as to the true situation, it was Lescure who objected to this on the theory that it would embarrass him and hurt his reputation in the trade.

The defendants do not contend that there was any misrepresentation by the plaintiff to them. Nor do they contend that any of the defendants was in any way harmed by any misrepresentation by the plaintiff. But the defendants do contend that, since the plaintiff was a party, with Lescure, in the early misrepresentations as to the true ownership of Bearing Jobbers, the plaintiff now has such unclean hands that it cannot now come into equity and prevent Lescure from appropriating to himself this stock which belongs to the plaintiff and which now has become quite valuable.

The doctrine that equity will not come to the aid of a person with unclean hands is not as broad as the defendants apparently would have us believe. If this doctrine were so broad as to foreclose the granting of equitable relief to every person who had ever misrepresented any fact, few persons could come into equity with any hope for relief.

The findings of the master that there were no misrepresentations by the plaintiff to the defendants is fully sustained by the evidence; as was also his finding that a very close relationship existed between the plaintiff and Bearing Jobbers and that this was well known throughout the industry.

There are cases which say that the misconduct on the part of a plaintiff which will defeat a recovery in a court of equity under the doctrine of unclean hands must have been conduct in connection with the very transaction being considered and must have been misconduct toward the defendant. As the Supreme Court of Illinois said in Ross v. Ross, 406 Ill. 598, 604, 94 N.E.2d 885, 888:

"* * * 'The dirt upon plaintiff's hands must be his bad conduct in the transaction complained of. If he is not guilty of inequitable conduct toward the defendant in that transaction his hands are as clean as the court can require', and, as the court also stated in that opinion, 'The wrong must have been done to the defendant himself, and must have been in regard to the matter in litigation.' "

See also Evangeloff v. Evangeloff, 403 Ill. 118, 126, 85 N.E.2d 709, Shadden v. Zimmerlee, 401 Ill. 118, 128, 81 N.E.2d 477, and Mills v. Susanka, 394 Ill. 439, 445, 68 N.E. 2d 904.

█ Even without relying on the limitations placed on the unclean hands doctrine by these cases it seems clear in the instant case that although there apparently were some misrepresentations by the plaintiff in the early days of Bearing Jobbers, that those to whom the misrepresentations were made were not actually very much interested in the question of the ownership of the shares and that they were in no way harmed by such misrepresentations. The record clearly shows that in 1949 the entire industry would have definitely known the actual ownership of these shares except for the fact that Lescure would not then cooperate with the Nice Company in making the facts known.

We do not think the record in this case shows any such fraudulent conduct on the part of the plaintiff as to justify denying relief in a court of equity on the theory that plaintiff had come into court with unclean hands. In New York Trust Co. v. Island Oil & Transport Corp., 2 Cir., 34 F.2d 655, at page 656, the court, in considering the consequences of a sham contract which the parties executed only for the purpose of showing compliance with a requirement of the Mexican Government, said, on the question of whether legal obligations should be attached to utterances which would otherwise not create them because they were part of a plan to deceive third persons:

"We are to distinguish between such a situation and one in which the person deceived has acted in reliance upon the truth of the utterances, and bases his rights upon them, for here we are only concerned with the existence of obligations between parties equally implicated. We cannot see why their common fault should so change the relations between them. * * * Here we must raise an obligation where none would otherwise exist, because by hypothesis both were concerned in a fraud upon a third. As compensation, this would be fruitless; as punishment, it would be capricious; as law, it would create an obligation *ex turpi causa*."

So, in the instant case, we cannot see how the misrepresentations made by the plaintiff to third persons who had little interest in the facts, misrepresentations which harmed no one, should in effect transfer to Lescure the actual ownership in corporate stock which had been placed in his name only as nominee or as trustee by the employer for which he had worked for more than twenty years. A court of equity is not required to grant such a reward to an employee who has so broken faith with his employer.

We think the judgment of the District Court correct in ordering the defendants M. H. Lescure and his wife, Marie M. Lescure, as president and secretary, respectively, of Bearing Jobbers, Inc., to cause the shares in question to be properly transferred to the plaintiff, in enjoining them from interfering with the rights of the plaintiff as the owner thereof, and in dismissing the counterclaim of the defendant M. H. Lescure.

█ In view of the circumstances in this case we cannot say that there was error in the amount fixed by the District Court as compensation for the master and for the disbursements made by the master or in the division of these costs between the plaintiff and the Lescures.

The judgment of the District Court is affirmed.