**Catherine L. Turner FULK, Administrator of the Estate of Larry D. Turner, Deceased, and Catherine Turner Fulk, Plaintiffs–Appellants,**

v.

**ILLINOIS CENTRAL RAILROAD COMPANY, Defendant–Appellee.**

No. 93–1404.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1993.

Decided April 5, 1994.

Thomas J. Logue (argued), Glenn & Logue, Mattoon, IL, for plaintiff-appellant.

Richard F. Record, Jr. (argued), Craig & Craig, Mattoon, IL, Charles W. Webster, IL Cent. R. Co., Chicago, IL, for defendant-appellee.

Before BAUER and FLAUM, Circuit Judges, and ROSZKOWSKI, District Judge.*

FLAUM, Circuit Judge.

Catherine Turner Fulk ("Fulk") filed a claim for damages against the Illinois Central Railroad Company ("Illinois Central") under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.* Fulk alleged that various acts of negligence by Illinois Central caused the death of her late husband, Larry D. Turner ("Turner"). In particular, Fulk's Amended Complaint raised four separate charges of negligence.[1] The

---

* The Honorable Stanley J. Roszkowski of the Northern District of Illinois, sitting by designation.

1. Paragraph 12 of the Amended Complaint reads as follows:

12. The death of the decedent was directly and proximately caused by the negligence of the Defendant in the following particulars:

(a) Defendant provided decedent with an unsafe place in which to work.

case went to trial on December 17, 1992, bifurcated as to the issues of liability and damages. At the close of evidence, the district court allowed in part and denied in part Illinois Central's Motion for Judgment as a Matter of Law. Fed.R.Civ.P. 50(a). Specifically, the court granted judgment on paragraph 12(d) of the Amended Complaint. Thereafter, the jury returned a verdict in favor of Illinois Central on the three remaining issues. Following the court's entry of judgment for Illinois Central, Fulk timely filed a Motion for New Trial, Fed.R.Civ.P. 59, which the court denied in a brief order entered on February 5, 1993. Fulk appeals from this order. We affirm.

## I.

In their briefs, both parties presented encyclopedic recitals of the facts adduced at trial. We reproduce here only those facts necessary to set the context and decide the issue before us.

At the time of his death on November 19, 1990, Larry Turner had been employed as a switchman for the Illinois Central Railroad for almost twenty years. As a switchman, Turner's daily routine required him to walk several miles a day over rock ballast and to throw perhaps as many as fifty switches, some of which were difficult to throw because of their age or state of disrepair. In short, his job often involved long hours and strenuous work.

> (b) Defendant, through a medical doctor hired by Defendant to examine the decedent, had knowledge that the decedent was suffering from high blood pressure and hypertension and knew that he was and could be in danger of a ventricular arrhythmia attack in the event of physical stress brought on by working long hours over a long period of time and/or insufficient help and/or having to exert great physical force to throw the switches. That even though the Defendant, its agents, servants, employees and the doctors Defendant hired to examine the decedent had knowledge of this fact, nevertheless it negligently caused the decedent to suffer physical stress by requiring him to work more than an 8–hour shift for an unbroken string of three days prior to his death on November 19, 1990, by failing to provide a third man for his switching crew as aforesaid, and by causing him to use great physical strength in order to throw the switches in his job as aforesaid.

Turner's medical records indicate that he suffered from high blood pressure throughout his career. Periodic physical examinations from 1972 through 1982 revealed a few temporarily disabling ailments, but Turner's blood pressure apparently was under control as it never caused him to be disqualified from work. On July 25, 1983, however, Dr. J.R. Mallory examined Turner on behalf of Illinois Central and found him to be "moderately overweight and hypertensive." Dr. Mallory notified Illinois Central that Turner could be continued in service, but required Turner to submit a status report in two weeks regarding his weight and blood pressure. Illinois Central then sent a letter reflecting Dr. Mallory's directive to Turner. Just over a month later, Turner was re-examined by Dr. Mallory (this time as Turner's private physician) who found improvement in Turner's blood pressure and weight. Dr. Mallory prescribed medication and requested another status report in six months. Once again, Dr. Mallory transmitted his findings to Illinois Central, which, in turn, sent a letter to Turner imparting the doctor's orders. After the six month interval had passed, Dr. Mallory examined Turner and reported to Illinois Central that Turner's hypertension and weight were under satisfactory control. The doctor told Turner that he should continue follow-up with a private doctor, but no longer required status reports. Illinois Central again sent Turner a letter memorializing Dr. Mallory's findings.

> (c) That the Defendant had knowledge of decedent's hypertension and high blood pressure and knew or should have known he was suffering from heart disease and had a duty to assign decedent to work for which he was reasonably well-suited; which duty it breached by negligently assigning decedent to perform work as a member of a yard switching crew, the performance of which was dangerous to his health and his life because of his hypertension and high blood pressure, and heart disease.
>
> (d) The Defendant, with knowledge of decedent's high blood pressure and hypertension, should have had him examined medically more frequently with more detailed medical examinations to determine his physical ability to perform his switchman's job without danger to his life.

From 1986 to 1988, Turner visited various doctors for treatment of assorted ailments, including high blood pressure. As of May 4, 1988, it appears that Turner had settled on Dr. Mark Dettro as his private physician. In that capacity, Dr. Dettro examined Turner on several occasions and prescribed Lopressor to treat Turner's hypertension. On September 25, 1989, Turner submitted to Illinois Central a request for a periodic examination, and was examined four days later by Dr. Dettro. In his report, Dr. Dettro stated that Turner's hypertension was under "poor control," but nevertheless certified that Turner was physically able to work "various jobs." In addition, Dr. Dettro told Turner to return (as a private patient) in sixty days for a check-up. On October 11, 1989, Illinois Central's medical officer notified Turner's employing officer that Turner was physically qualified as a *brakeman*. Dr. Dettro's report to Illinois Central makes no mention of follow-up examinations and the record indicates no further communications by Illinois Central to Turner with respect to Dr. Dettro's report or recommendations.

At trial, Dr. Dettro testified that he, in fact, believed he was examining Turner for work as a brakeman, a job which he understood to require "low to medium physical exertion." Dr. Dettro further testified that, in view of Turner's high blood pressure, he would not have approved Turner for continued service if he had appreciated the distinction between a brakeman and a switchman. Dr. Dettro was certain that he communicated to Turner the seriousness of his condition and the need to continue taking his medication and schedule periodic check-ups. Dr. Dettro also testified that Turner failed to schedule a return visit within sixty days, or at any time prior to his death. After Turner neglected to appear as requested, Dr. Dettro did not attempt to contact Turner. Further, the record discloses no evidence of Turner visiting any doctors after his September 29, 1989, examination.

On November 19, 1990, Turner suffered a fatal ventricular arrhythmia while on the job. At trial, Dr. Stuart Frank, a cardiologist, testified for Fulk. According to Dr. Frank, an autopsy of Turner showed evidence of congestive heart failure that had been present for "weeks, months, or even longer, possibly." In Dr. Frank's opinion, this condition could have been diagnosed if Turner had been seen by a physician "certainly in the few days or few weeks prior to his death." Dr. Frank believed that Turner should have been examined frequently enough to ascertain whether his blood pressure was under control, but Dr. Frank could not say precisely how often. If Turner's blood pressure had been treated regularly, and if he had lost weight and stopped smoking, Dr. Frank testified that Turner probably would have lived out the normal life expectancy for a man his age.

Although Dr. Frank testified that the autopsy report showing excessive heart weight revealed a "gross discrepancy" with Dr. Dettro's clinical finding of a normal heart size, Dr. Frank had no criticism of Dr. Dettro's September 1989 examination of Turner. Dr. Frank testified that while Dr. Dettro's examination could not have determined the size of the heart, it could have determined whether Turner had congestive heart failure at that time.

Dr. Gerry Smyth, a cardiologist, testified as an expert for Illinois Central. It was Dr. Smyth's opinion that Turner could not have been in congestive heart failure at the time of Dr. Dettro's examination. In Dr. Smyth's view, Turner's congestive heart failure and heart disease could not have been discovered unless Turner had submitted to an examination within a month or so of his death. Thus, Dr. Smyth did not believe that Turner's death would have been avoided even if Illinois Central had required regular examinations as frequently as every six months "unless the examination happened to have just occurred within a month prior to his death."

## II.

▮ Fulk contends that she is entitled to a new trial because the district court erred in granting judgment as a matter of law to Illinois Central on the allegations raised in paragraph 12(d) of her Amended Complaint. We review a district court's decision to grant judgment as a matter of law *de novo*. *Harrison v. Dean Witter Reynolds, Inc.*, 974

F.2d 873, 884 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993); *Warrington v. Elgin, Joliet & Eastern Ry. Co.,* 901 F.2d 88, 89 (7th Cir.1990). Viewing the evidence in the light most favorable to the nonmoving party, we must ascertain whether there is any evidence upon which a jury could reach a verdict for the party producing it, upon whom the onus of proof is imposed. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986); *Warrington,* 901 F.2d at 89–90.

■■■ We are, of course, mindful that Fulk's case arises under the FELA, a broad remedial statute that is to be construed liberally in order to effectuate its purposes. *Kulavic v. Chicago & Illinois Midland Ry. Co.,* 1 F.3d 507, 512 (7th Cir.1993). As we recently noted, the FELA "provides railroad workers not only with substantive protection against negligent conduct by the railroad, but also affords an injured worker a remedy suited to his needs, untrammeled by many traditional defenses against tort liability." *Id.* (citing *Atchison, T. & S.F. Ry. v. Buell,* 480 U.S. 557, 565, 107 S.Ct. 1410, 1415, 94 L.Ed.2d 563 (1987)). Hence, it is not surprising that the quantum of evidence necessary to establish liability under the FELA is lower than that required in an ordinary negligence action. *Harbin v. Burlington Northern Ry. Co.,* 921 F.2d 129, 131–132 (7th Cir. 1990) (noting examples of FELA actions that were submitted to a jury based upon "evidence scarcely more substantial than pigeon bone broth"). The test of a jury case under the FELA "is simply whether the proofs justify with reason the conclusion that employer negligence played *any part, even the slightest,* in producing the injury ... for which damages are sought." *Rogers v. Missouri Pacific R.R.,* 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957) (emphasis added). Thus, the FELA creates a lenient standard for plaintiffs seeking to avoid judgment as a matter of law. Nevertheless, because the FELA is not a strict liability statute, plaintiffs still must prove the traditional common law elements of negligence, including foreseeability, duty, breach, and causa-

tion. *Moody v. Boston and Maine Corp.,* 921 F.2d 1, 3 (1st Cir.1990); *Robert v. Consolidated Rail Corp.,* 832 F.2d 3, 6 (1st Cir. 1987).

The district court granted Illinois Central's Rule 50(a) motion only as to paragraph 12(d), which read as follows:

> The Defendant with knowledge of decedent's high blood pressure and hypertension should have had him examined more frequently with more detailed examinations to determine his physical ability to perform his switchman's job without danger to his life.

Relying on a recent First Circuit case, *Moody v. Boston and Maine Corporation,* the Court declined to submit paragraph 12(d) to the jury because the FELA imposes no duty on a railroad to perform periodic physical examinations on its employees. 921 F.2d at 3. Additionally, the court noted that employer liability attaches under the FELA only if, having undertaken to give examinations, the employer performs them negligently. Thus, finding no duty to examine and no direct evidence of negligence in the examinations given by Illinois Central, the court granted judgment as a matter of law on paragraph 12(d).

Fulk maintains that Dr. Dettro's September 29, 1989, examination of Turner may have imposed on Illinois Central various duties. In support of this argument, Fulk first attempts to distinguish *Moody* on its facts. Fulk asserts that *Moody* is inapposite here because there were no prior physical examinations performed on the decedent in *Moody* and the railroad knew little, if anything, of the decedent's deteriorating physical condition. Then, drawing on *Fletcher v. Union Pac. R. Co.,* 621 F.2d 902 (8th Cir. 1980), *cert. denied,* 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981), and *McGuigan v. Southern Pacific Co.,* 129 Cal.App.2d 482, 277 P.2d 444 (1954), Fulk submits that Dr. Dettro's September 1989 examination gave rise to several duties on the part of Illinois Central: (1) to perform the examination without negligence;[2] (2) to follow up and

---

**2.** As noted above, the district court acknowl-    edged this duty and concluded that Fulk had

monitor a life-threatening condition; and (3) to remove Turner from service if medically necessary. In light of these duties, Fulk argues that "[a]s a matter of law, the jury should have the right (a) to determine whether a duty existed under facts under the law; and, (b) whether Defendant breached that duty." Br. at 22. Accordingly, she contends that the district court improperly invaded the province of the jury by granting Illinois Central's Rule 50(a) motion.

■■■ We disagree. First, we note the division of labor between judge and jury in a tort case based on a negligence theory. "Duty is an essential element of negligence," *Homer v. Pabst Brewing Co.*, 806 F.2d 119, 121 (7th Cir.1986), and "[t]he determination of any question of duty—that is, whether the law imposed upon the defendant the obligation to protect the plaintiff against the consequences which occurred—is a question of law, and is not for the jury." *Gonzalez v. Volvo of America Corp.*, 752 F.2d 295, 300 (7th Cir.1985) (finding that the trial court should have granted defendant's motion for directed verdict on the basis that defendant had no duty to warn). Thus, while a jury does indeed determine whether a defendant has breached a duty, the question of whether a duty exists in the first place remains with the court.

We now turn to whether the district court erred in entering judgment as a matter of law on the basis that Illinois Central owed Turner no duty of the kind alleged in paragraph 12(d) of the Amended Complaint. As noted above, Fulk calls our attention to *Fletcher* and *McGuigan* in support of her contention that the court did so err. Like *Moody, Fletcher* expressly states that a railroad has no general duty to ascertain whether an employee is physically fit for his job. 621 F.2d at 909. At the same time, *Fletcher* does identify various duties under the FELA, including a duty to assign employees to work for which they are reasonably suited and a duty not to perform physical examinations negligently.[3] *Id. McGuigan* stands for the

proposition that in certain circumstances—where "the employer knew that [decedent] was in such poor physical condition as not to be able to handle the job of herder without danger to his health, *and the decedent was ignorant of these limitations*,"—a railroad does have a duty to examine. 277 P.2d at 454 (emphasis supplied). Fulk has not identified, nor have we found, any additional cases on point.

We are not persuaded by Fulk's argument that *Fletcher* and *McGuigan* compel a different result in this case. Fulk presented no evidence from any physician establishing that Dr. Dettro negligently performed his September 29, 1989, examination of Turner, and, in fact, Fulk's medical expert, Dr. Frank, conceded on cross-examination that he had no criticism of Dr. Dettro's examination. *Fletcher* and *McGuigan* are relevant to this case insofar as they establish that once an employer undertakes to provide medical attention it must do so in a non-negligent manner. While this general duty to provide competent medical care may include, in an appropriate case, a specific duty to *advise* an examinee that further medical supervision is necessary for his well-being, it has never been thought to require that an employer *compel* a competent adult patient to submit to further treatments or examination. Nor should it. Fulk submits that Turner may have ignored his doctor's advice and decided to await orders from his direct employer before proceeding with any further treatment. That is his prerogative, but *requiring* an employer to oversee an employee's compliance with doctor's orders is too paternalistic a mandate for a court to impose, even under the liberal strictures of the FELA. We emphasize that this is not a case where an employer at all interfered with an employee's doctor-patient relationship; here, rather, the employee independently expected his employer's direction at every turn. This he may do, but, having done so, we hold that he cannot blame Illinois Central for the result.

---

failed to present any direct evidence of negligence on the examinations given by Illinois Central.

3. We think it clear that Dr. Dettro was an agent of Illinois Central with respect to the September 29, 1989, examination of Turner in that the examination was ordered by Illinois Central. *Cf. Fletcher,* 621 F.2d at 909 nn. 9–10.

In reaching this conclusion, we have assumed that Turner made this choice. As Dr. Dettro testified, Turner "was told in the office notes he was supposed to come back in" for an appointment within sixty days. In her appellate brief, Fulk alludes to Turner's possible ignorance by hypothesizing that a jury could find that Turner did not hear Dr. Dettro tell him to return in sixty days, or that if Turner did hear Dr. Dettro, he did not understand the directive. Fulk supports her theory by offering her own testimony that Turner failed to mention a check-up to her after the September 29 exam. Without any further support, we find these submissions too speculative to impeach Dr. Dettro's testimony and the natural conclusions that flow from it. *See Tennant v. Peoria & Pekin Union Ry. Co.,* 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944).

Finally, we consider Fulk's argument that Illinois Central's continued monitoring of Turner's condition pursuant to Dr. Mallory's orders following the 1983 examination gave rise to a duty to follow a similar monitoring regimen following Dr. Dettro's 1989 examination. This "estoppel" theory sounds in contract, not in tort, and while we may think that undertaking such a monitoring practice might be enlightened self-interest on the part of a business, at least to the extent that healthy employees are productive employees, we cannot agree that prior monitoring gives rise to a legal duty of the kind claimed by Fulk.

### III.

Paragraph 12(d) of Fulk's Amended Complaint simply alleged that Illinois Central should have examined Turner more frequently and in more detail. We have examined the few cases that address the scope of a railroad's duty to examine its employees and we conclude that the FELA imposes no such duty on Illinois Central. We hold therefore that the district court properly granted judgment as a matter of law pursuant to Fed. R.Civ.P. 50(a).[4] Furthermore, we find that the exclusion of paragraph 12(d) did not pre-

vent the jury from making the connection between Turner's death and Illinois Central's alleged negligence as to paragraphs 12(a), (b), and (c). Fulk received a fair trial and the district court properly denied her motion for a new trial under Fed.R.Civ.P. 59. Accordingly, the judgment and order of the district court are AFFIRMED.

---

4. Because we decide that the FELA imposed no duty on Illinois Central to examine Turner more frequently and in more detail, we need not reach

Illinois Central's argument that Fulk failed to present evidence that the failure to monitor proximately caused Turner's death.