TRW TITLE INSURANCE COMPANY, a corporation, on its own behalf and as a subrogee of its insureds, Plaintiff–Appellant,

v.

SECURITY UNION TITLE INSURANCE COMPANY, a corporation, Defendant–Appellee.

and

TRW TITLE INSURANCE COMPANY, Plaintiff,

v.

SECURITY UNION TITLE INSURANCE COMPANY, Defendant, Third–Party Plaintiff–Appellee,

v.

LIBERTY NATIONAL TITLE INSURANCE COMPANY, d/b/a Liberty Title Insurance Company, a corporation, Third–Party Defendant–Appellant.

Nos. 97–2226, 97–3155.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1998.

Decided Sept. 1, 1998.

Rehearing Denied Oct. 13, 1998.

823

Joshua G. Vincent, William J. Holloway (argued), Michael J. Leech, Hinshaw & Culbertson, Chicago, IL, for Plaintiff–Appellant.

Thomas A. Doyle (argued), Barrie L. Brejcha, Adriane W. Buckland, Baker & McKenzie, Chicago, IL, for Defendant–Appellee.

William J. Holloway (argued), Hinshaw & Culbertson, Chicago, IL, for Plaintiff.

Gerald Haberkorn (argued), Lowis & Gellen, Chicago, IL, for Defendant–Appellant.

Thomas A. Doyle (argued), Baker & McKenzie, Chicago, IL, for Defendant–Appellee.

Before COFFEY, KANNE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

During the 1980's some said greed was good. If so, then title insurance agent Ed Wells was a saint, for beginning in 1986 he stole upwards of $3 million from the closing escrow accounts he administered. The 1990's find Wells in prison (apparently for other, unrelated crimes) and the two title insurers he represented during his thievery—Security Union Title Insurance Company and TRW Title Insurance Company, who, at different times, insured the escrow depos-

its that Wells stole—fighting over who should pick up the tab for Wells' misdeeds.

Originally, Wells was a lawyer who had several law offices in the Chicago area. Because he handled a lot of real estate transactions he started Liberty National Title Insurance Company as a title insurance and closing escrow agent and then referred all his clients to it. He increased his business by reducing his legal fees, knowing that he would recoup them through Liberty.

A title insurance policy, which is issued at the time of the closing of a real estate transaction, is essentially a promise that the insured party will not suffer a loss if the title turns out to be less secure than it appears to be. While title insurers can sell insurance on their own, they often enlist the services of retail title insurance agents like Liberty. Many of these agents, like Liberty, also offer themselves as escrow agents in order to provide the parties to real estate transactions with a one-stop closing service.

An escrow agent serves as a neutral depository for the monies and documents involved in a real estate deal. The legal relationship between the parties to the real estate deal and the escrowee is detailed in the closing escrow agreement in which the parties give the escrowee specific written instructions on how the transaction is to be done-the escrowee is accountable to and acts for the mutual benefit of all parties to the deal. In the best of all possible worlds, after all of the monies and documents are handed over to the escrowee, it follows the instructions about the preconditions to the closing—title searches, etc.—and then disburses the funds to the seller, his mortgagee(s), and also the surveyors, appraisers, lawyers, and the tax man. And, as title insurance is issued at the time of the closing, escrowees also disburse premiums to the title insurer.

The best of all possible worlds, as we just described it, is not always the norm. Because closing is often a slow process, funds often stay in the escrow account for a long time, and that creates an opportunity for embezzlement. So long as new deposits keep rolling in, a crooked escrowee can use the "float" created by new money coming in to keep early deposits for himself by using the later deposits to pay earlier disbursements. Unless new money stops coming in, the escrowee can keep repeating the process and, theoretically, nobody would be the wiser.

Because of this ever-present risk and the market power of mortgage lenders, title insurers are often forced to insure the lenders' escrow deposits if they want the lenders' business. In so-called escrow protection letters the insurers promise they will indemnify the lender/depositor for losses caused by a title agent/escrowee's fraud or failure to follow disbursement instructions.

Because of this potential insurer liability, title insurers keep a close eye on their agents. They do this primarily by auditing the escrow account. Suspicious signs include withdrawals in even dollar amounts and overdrafts—disbursements should always match deposits, so there should never be a negative balance. However, because the float masks any shortage and disguises the true balance of the account, title insurers require their agents to reconcile the account—match the disbursements up with the deposits.

Back on January 1, 1984, Security—at the time called Safeco; its name was changed to Security after Chicago Title Insurance Company acquired it in 1988—signed Liberty to an exclusive agency contract. ·Security, of course, had to issue escrow protection letters as an incentive to lenders to deal with Wells and buy Security's title insurance policies.

Because it would be on the hook for any of Wells' escrow hijinks, the contract featured several safeguards. It required Liberty to keep all escrowed funds in a segregated bank account—segregated, that is, from non-escrow monies; it didn't require individually segregated accounts for each deposit. In case of a shortage, it gave Security the right to cancel the contract and place a lien on Liberty's assets. And it gave Security the right to audit Liberty at any time.

Security followed a practice of annual audits. Its first audit was in October of 1985. By that time Liberty had not yet reconciled its account, but it promised to do so. In May of 1986, the second audit, the auditor noted that Liberty was "[j]ust beginning to reconcile." However, in the 1987 audit the auditor

stated that Liberty hadn't been reconciling the escrow account.

Despite this, the Liberty/Security arrangement was lucrative for both parties. Liberty averaged around 250 closings per month, and roughly $15 million went through the escrow account every 30 days. Between 1986 and 1989 Security earned between $300,000 to $500,000 a month in title insurance premiums. But, starting in 1986, Wells began using the float created by this high volume business to pay Liberty's operating costs, creating a shortage in the escrow account—and leaving Security liable on its letters if all disbursements suddenly became due.

While Security didn't catch the embezzlement, it did catch some of Wells' other shenanigans. The Liberty/Security contract required Liberty to do its title research in Liberty's title plant—a database of land titles. Liberty was supposed to pay a certain amount per search. However, Wells rigged up a way of avoiding the search costs while still using the plant, and this trick saved Liberty significant money.

Security discovered Wells' antics in 1988 so it sued Liberty, seeking damages for breach of contract, fraud, and RICO violations and also a declaration that it could cancel the whole agency agreement because of Liberty's title plant abuse. A court dismissed the declaratory suit, ruling that Security couldn't cancel the whole agency agreement because fraud occurred in the title plant.

The parties tried to settle the remainder of the suit and eventually struck a bargain. On November 13, 1989, Security sent Liberty a draft of the settlement agreement. The draft called for Liberty to allow Security out of the contract, pay $235,000 in back title plant fees, and permit an audit of the escrow account. In addition, the draft agreement obligated Liberty to "immediately and in good faith undertake with all due diligence, to obtain a new underwriter for Liberty's title insurance agency services."

A week after getting the draft Wells contacted Eric Alejos, an agency recruiter for TRW Title Insurance Company. Wells said that Security was dissolving its relationships with Illinois agents and had given him leave to find another insurer. This was not the truth, the whole truth, and nothing but the truth. During the application process Wells also made two other misrepresentations; he said that Liberty was solvent and, on the agency application, he failed to list Security's lawsuit in the blank reserved for pending legal actions.

While a pre-signing audit would seem sensible-TRW now has a policy requiring such an audit for any title agent handling the volume of deposits Liberty handled—TRW blew it off. While it checked Wells' personal references, it *didn't* do any credit check on Liberty's banking, leasing, or money handling activities. Concerning the escrow account, TRW failed to contact the bank that held the account, investigate Liberty's escrow practices, talk to the other Liberty employees, or contact state licensing authorities. And, finally, TRW did no public records check, which would have turned up the title plant lawsuit and exposed one of Wells' misrepresentations. The reason behind this shoddy investigation was TRW's fear of alerting Security that it was courting Liberty.

On December 4, 1989, TRW signed Liberty up as a TRW title insurance agent. After the signing, Liberty dealt with all new—post-December 4, 1989–depositors on TRW's behalf, and TRW issued escrow protection letters to all of them. However, instead of setting up a new account for the TRW depositors' money, Liberty and TRW used the same old escrow account that still held Security's depositors' money—violating the provision of Security's agency agreement (which was still viable at this point) requiring segregation of Security depositors' funds.

Not knowing what was going on between Liberty and TRW, on December 5–6 Security's auditors, led by Pat Kendall, tried to audit the escrow account, as required for the settlement. The account's October bank statement showed occasional overdrafts, and the November statement showed the same kind of overdrafts alongside even-dollar-amount withdrawals of $60,000 and $235,-000—the $235,000 turned out to be the settlement payment to Security, paid in the form of a cashier's check. While these red flags made Kendall suspect that "something was wrong," she didn't act on her suspicion—or even write a report for that matter—perhaps

because positive balances preceded and followed the overdrafts and there was a positive balance at the end of each month. In any event, Security didn't consider Kendall's audit a complete one, for on December 21 Security sent another auditor, Ever Baldovino, to Liberty. Baldovino reported that Wells refused to give him sufficient information to do a full audit.

Finally, on December 28, 1989, Wells told Security about his deal with TRW. Meanwhile, the transactions of most of the depositors protected by Security's escrow letters (depositors from before December 4, 1989) closed without incident—Security canceled its remaining outstanding letters, but TRW had already issued letters covering those depositors. The shortage in the commingled account expert testimony pegged it at $2.9 million on December 4 and at $3.1 million on December 30–meant that disbursements for these closings came out of funds belonging to the new TRW depositors. In short, the liability for the shortage, based on the escrow protection letters, passed from Security to TRW.

After the difficulties during its prior audits, Security got a court order to compel Liberty's cooperation in January 1990. Kendall performed that audit on January 29–31, 1990. On the December bank statement she saw more red flags—three even-amount transfers, $20,000, $40,000 and $60,000 into other accounts in the same bank—but still did nothing about it, and again she left no report. Afterwards Security told the court that it completed the audit, the last condition of settlement. The settlement went through, and on February 23, 1990, Security terminated the agency contract with Liberty.

As soon as Security was out of the picture, Liberty and TRW closed the old escrow account and opened a new one. Things ran without incident until February 1991, when Liberty remitted a premium with a check drawn on the escrow account—normally Liberty laundered the escrow money by sifting it through other accounts before sending it on. Its curiosity aroused, TRW audited Liberty and discovered the shortage (which had ballooned to $4.1 million in the meantime). TRW returned the premium check to the account, but instead of forcing Liberty or Wells to pay off the shortage, it took over the administration of the escrow account and ran it on the float for the next 18 months.

In June of 1991 TRW put $57,000 of its own money into the account. In August of that year it made a deal with Wells; a workout deal that called for TRW to lend money directly to Wells personally, not to Liberty, in order to take care of the shortage and to provide operating capital for Liberty. For his part, Wells gave TRW a note collateralized by all the stock of Liberty—which TRW valued at $2.6 million—and other property—real property valued at $788,000 and a title plant Wells had developed. The agreement also gave TRW increasing control of Liberty—an option to acquire equity ownership of an additional 10 percent of Liberty's stock for each year the loan was outstanding—and provided for a full TRW takeover.

TRW provided the funds called for in the deal gradually from August of 1991 through August of 1992—the biggest payments were $495,000 in August of 1991, $1.2 million in December of 1991, and $1 million in May of 1991—a total of $3,390,283. These dollars covered the shortage.

The deal, however, didn't pan out as planned and TRW gradually took over all of Liberty's operations. By February 1992 TRW, which controlled the escrow account since it found the shortage, was appointing Liberty's officers. On June 1, 1992, TRW seized total control from Wells. The next day it sold Liberty to a TRW affiliate for $2.6 million. The TRW/Liberty escrow account closed in August 1992. After another internal transfer TRW sold Liberty outside the TRW umbrella sometime in 1993.

While TRW realized $2.6 million from the sale of Liberty (and apparently still had the other assorted collateral), it nevertheless thought it was left with a deficiency. Realizing that the shortage actually existed while Security's letters were outstanding, TRW decided to go after Security. It filed this suit[1]

1. The complaint alleged a civil RICO violation, but that claim was dismissed early under Fed. R. Civ. P. 12(b)(6). Luckily for TRW (a Kansas corporation with its principal place of business in Kansas), it was diverse from Security (a California corporation which had its principal place of business in Illinois).

containing eight counts, but for our purposes only four relevant ones: fraud, unjust enrichment, co-trustee liability,[2] and equitable subrogation to the claims of the post-June 1992 TRW depositors (the last 34 depositors before the TRW/Liberty account closed in August of 1992, whose deposits totaled $4,200,-000) against Security. Security impleaded Liberty as a third-party defendant.

Predictably, Security filed a motion to dismiss. On May 13, 1994, Judge William T. Hart in the district court dismissed the unjust enrichment claim, finding that TRW's negligence and haste in signing up Liberty meant that Security's enrichment (by avoiding liability) wasn't unjust.

Later the case was transferred to Judge Elaine E. Bucklo, and Security moved for summary judgment on the remaining claims. On May 3, 1995, Judge Bucklo dismissed the fraud claim. She recognized TRW's theory—that, as part of the settlement of the title plant suit, Security conspired with Liberty to hook a sucker principal to bear the insurer's liability for the shortage—as a valid one. But she held that this theory required Security to have actual knowledge of the shortage at the relevant time and that the evidence on this point was insufficient. On the eve of trial, TRW moved for reinstatement of the fraud claim, but Judge Bucklo denied the motion.

After both sides completed their case at trial, Judge Bucklo directed a verdict against the cotrustee claim but reserved her decision on the subrogation claim to let the jury have a crack at it. On June 28, 1996, the jury returned a verdict for TRW and awarded it $1.2 million—it also found for Liberty on the third-party contribution claim.

Security then renewed its motion for judgment as a matter of law on the subrogation claim, and 9 months later Judge Bucklo granted it. A party who is primarily liable for another's injury, she held, can't become subrogated to a claim, even if he pays it, *American Nat'l Bank & Trust Co. v. Weyerhaeuser Co.*, 692 F.2d 455, 461 (7th Cir.1982) ("equity will permit only parties free from wrongdoing themselves to assert rights of [equitable] subrogation against third parties"), and the judge determined that TRW was primarily liable to its depositors because it ran the account on the float, perpetuating the shortage and kicking it back to the last depositors.[3]

TRW appeals both the pre and post-trial rulings and we review the case *de novo*. *Colfax Corp. v. Illinois State Toll Highway Auth.*, 79 F.3d 631, 632 (7th Cir.1996) (motion to dismiss); *Robinson v. PPG Indus., Inc.*, 23 F.3d 1159, 1162 (7th Cir.1994) (summary judgment); *Fulk v. Illinois Cent. R.R. Co.*, 22 F.3d 120, 123 (7th Cir.1994) (judgment as a matter of law); *Sokol Crystal Prod., Inc. v. DSC Communications Corp.*, 15 F.3d 1427, 1432 (7th Cir.1994) (renewed motion for judgment as a matter of law). The parties agree that the law of Illinois controls this diversity case.

■ Because the fraud claim was dismissed on summary judgment, the issue is whether a reasonable jury could credit

---

2. *Restatement (2d) of Trusts* § 258(1)(b) provides that where co-trustees are each liable for a breach of trust, and "one of them receives a benefit from the breach of trust, the other is entitled to indemnity from him to the extent of the benefit." TRW alleges that (1) it and Security were co-trustees of all the deposits in the escrow account during December 1989, (2) Liberty, as agent of both, breached the trust when it used the funds of the new TRW depositors to close the old Security depositors' deals, and (3) TRW benefitted to the tune of total relief from liability on its letters.

3. Although Judge Bucklo entered a minute order on Liberty's contribution verdict, the clerk of the court forgot to enter a final judgment form on that claim. Liberty didn't discover this mistake until after Judge Bucklo granted Security's renewed motion for judgment as a matter of law and, to make a long story short, Judge Bucklo refused Liberty's request to enter the final judgment on the jury's verdict for Liberty against Security *nunc pro tunc* as of June 28, 1996. Because the proper ground for dismissal was mootness—Liberty's liability was derivative of Security's, so when Judge Bucklo let Security off the hook the claim against Liberty was mooted, *Faser v. Sears, Roebuck & Co.*, 674 F.2d 856, 860 (11th Cir.1982)—entry of the judgment on the verdict was meaningless and moot. Liberty appeals, in its own words, to protect itself in case we reverse Judge Bucklo. Because we affirm, the proper ground for dismissal of Security's third-party claim is indeed mootness, and the prior verdict is meaningless and of only academic interest to Liberty.

TRW's claim. *Schmidt v. Sheet Metal Workers' Nat'l Pension Fund*, 128 F.3d 541, 545 (7th Cir.1997). In Illinois, fraud requires proof "(1) that the defendant made false statements of material fact, (2) knowing that they were false, and (3) intending that the plaintiff would rely on them; (4) that plaintiff did rely, (5) that this reliance was justified, and that (6) plaintiff suffered damage as a result." *General Motors Acceptance Corp. v. Central Nat'l Bank of Mattoon*, 773 F.2d 771, 778 (7th Cir.1985).

Proceeding elementally, there is no question that Wells had the requisite fraudulent intent. His misrepresentations of solvency and of his reason for approaching TRW were material ones—especially when, by signing him up, TRW stood to bear the brunt of his insolvency by issuing escrow protection letters. Wells surely knew his statements were false and intended that TRW would rely on them.

■ However, TRW's suit isn't against Wells so it must find a way to attribute his fraudulent intent to Security. To succeed, TRW needs sufficient evidence that Security knew of the shortage—and its impending liability—at the time it allegedly sent Liberty out to look for a new principal. The only evidence that Security sent Liberty out to get a new title insurer to carry the load was the November 13, 1989, draft settlement agreement which required Liberty to use due diligence to find a new principal. This provision has a perfectly innocent justification—as a concession to Liberty to allow it time to find a new principal to continue its business—but, drawing all reasonable inferences favorable to TRW, we think a jury could find it fraudulent, but only if TRW had evidence of actual knowledge (or its equivalent, deliberate indifference) of the shortage at the time the provision was drafted. However, try as it might, TRW cannot demonstrate that crucial link. While it has strong evidence of Security's deliberate indifference towards the shortage—namely, auditor Kendall's suspicions—this knowledge didn't take hold until December 5 (or 6), nearly a month after the draft. Grasping at straws, TRW argues that the combination of TRW's knowledge that Wells wasn't reconciling the account, combined with its belief that Wells acted fraudulently under the title plant agreement, establishes deliberate indifference. We disagree. The fraud concerning the title plant dealt with a completely different facet of the agreement, and while it made Security generally suspicious of Wells—enough so as to want to get out of the agency agreement—it didn't finger any shortage. As for the failure to reconcile, Security had this knowledge in 1985–87, and its failure to take any action to deal with a shortage within a reasonable time afterward defeats any inference of knowledge. Besides, we find it hard to believe that Security would fraudulently conspire to pass along a shortage when, by all accounts in the record, Liberty was profitable enough to pay off the shortage itself.[4] Because the record as a whole shows insufficient evidence of fraud, we won't deal separately with TRW's contention that Judge Bucklo abused her discretion by refusing to reinstate its fraud claim on the eve of trial.

■ So, while there is insufficient evidence that Security intended to defraud TRW, Security still retains the benefit of that fraud and TRW is still stuck with the loss. With that said, we turn to TRW's claim that the ability to avoid liability on its outstanding letter unjustly enriched Security. A claim for unjust enrichment exists when a defendant (1) receives a benefit, (2) to the plaintiff's detriment, and (3) the defendant's retention of that benefit would be unjust. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (1989). As we said, Security benefitted when its liability on the letters was extinguished by Liberty's misapplication

---

4. In addition to the problems with fraudulent intent, TRW also can't prove justifiable reliance. In the title insurance game, we find it hard to believe that a title insurer entering into a deal with a title agent could ever deal on a handshake basis, as TRW basically did here. Embezzlement is an ever-present danger and easy to get away with, courtesy of the opportunity to ride the float. In its zeal to sign Liberty up—and conceal the fact from Security—TRW relied on Wells' statement of solvency, doing only a cursory background check on him. The true demonstration of the unreasonableness of this practice is that a formal audit—as now required by TRW's policy and always a reasonable pre-signing measure—would have turned up the overdrafts and the even-amount withdrawals that should have dissuaded TRW from dealing with Wells.

of TRW depositors' funds, for avoidance of a liability is clearly a benefit. TRW suffered a multimillion-dollar detriment when it became liable for the shortage under its letters.

■ But was Security's retention of the benefit unjust? Unjust enrichment is an equitable claim and, as a general principle of equity, "he who comes into a court of equity must come with clean hands." *Mills v. Susanka*, 394 Ill. 439, 68 N.E.2d 904, 907 (1946). Generally, a negligent mistake of fact won't dirty the plaintiff's hands, *see, e.g., Bank of Naperville v. Catalano*, 86 Ill.App.3d 1005, 42 Ill.Dec. 63, 408 N.E.2d 441, 446 (1980), but more serious misconduct, related to the transaction sued upon, will, *Long v. Kemper Life Ins. Co.*, 196 Ill.App.3d 216, 142 Ill.Dec. 925, 553 N.E.2d 439, 441 (1990).

■ TRW's failure to investigate Liberty isn't simply a negligent mistake of fact. In a title insurance industry rife with risk, TRW *intentionally* failed to investigate Liberty in order to conceal its courtship from Security. So, in essence, TRW's recklessness—it should have been aware of a substantial risk of a shortage when signing up a new title agent and it consciously disregarded that risk by failing to take any precaution against it-caused its loss. An unjust enrichment claim or other equitable relief is denied to a plaintiff whose recklessness caused his claimed injury. *See United States v. Burczyk*, 556 F.2d 394, 397 (7th Cir.1977) (finding that negligence, a lesser culpability than recklessness, can preclude an unjust enrichment claim when it contributes to the loss).

But is this just? We think it is. By disregarding the risks—as opposed to failing to appreciate them—TRW knowingly assumed the risk of accepting any shortage (its own detriment) and the risk that some other party would benefit by its acceptance of the shortage (Security's benefit). If the unclean hands defense tells us one thing, it is that equity doesn't find a benefit unjust where a plaintiff, through his own misconduct, intentionally places himself at risk. To allow an unjust enrichment claim in these circumstances would be to convert this equitable action into an insurance policy for those who gamble by avoiding safeguards they know they should take.

■ But if the only thing stopping TRW is its own misconduct, won't the equitable subrogation claim, where its payment enables it to step into the shoes of the innocent depositors, come to its rescue? A successful subrogation suit requires (1) a subrogor with a valid claim against the defendant and (2) the payment in full of that claim by a subrogee who isn't primarily liable but has some obligation (i.e., is not a volunteer) to the subrogor. *Weyerhaeuser*, 692 F.2d 455, 460 (7th Cir.1982). We review this grant of judgment notwithstanding the verdict using Illinois' standard, which approves of the action only where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand," *Bilski v. Scientific Atlanta*, 964 F.2d 697, 699 (7th Cir.1992). Because we agree with Judge Bucklo that TRW's claim is legally flawed, however, we need not weigh the evidence.

■ TRW claims subrogation as to the last 34 depositors. At least *some* of these depositors' deposits were used to satisfy other closings, and they were later made whole by the last of TRW's loan advances (not actual payments to the subrogors) into the account—as we noted before, most of the deposits were made before June of 1992 and only $262,801 trickled into the account after that date. Without these payments these subrogors would have had a claim against their escrow agent for breach of trust/fiduciary duty (escrow agents owe their depositors a fiduciary duty to disburse the deposits according to the terms of the escrow agreement, *Bescor, Inc. v. Chicago Title & Trust Co.*, 113 Ill.App.3d 65, 68 Ill.Dec. 812, 446 N.E.2d 1209, 1213 (1983)). The only problem (for TRW, that is) is that the escrow agent these depositors could have sued was TRW, which had taken over Liberty and was running the account on the float, using these depositors' funds for other purposes. This primary liability disqualifies TRW as a subrogee, *Weyerhaeuser*, 692 F.2d at 461, and rightly so, for it was TRW's decision to use their deposits for purposes other than those mentioned in the escrow agreement that caused their injury in the first place.

Finally, we get to the co-trustee indemnity claim, dismissed on a directed verdict. We review to see whether the jury could have found for TRW, taking all reasonable inferences in its favor. *Bay State Milling Co. v. Martin*, 916 F.2d 1221, 1226 (7th Cir.1990). TRW's argument here is that Security became a trustee (along with TRW) of the deposits due simply to its status as a title insurer with the ability to audit and control Liberty's escrow account. While the escrowee/depositor relationship is a fiduciary one as a matter of law, *Bescor*, 68 Ill.Dec. 812, 446 N.E.2d at 1213, the title insurer/depositor one isn't. But while there is no presumption of a fiduciary relationship, one can still be found—but only if there is clear and convincing evidence that the putative beneficiaries placed trust and confidence in the putative trustee, who accepted this dominance and the responsibility that comes with it. *Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir.1992). Here, the only interactions between the depositors and the title insurers were the title insurance policy and the escrow protection letter, simple contractual relationships. These can hardly amount to the placement of trust and confidence, and even if they did, the fact that depositors dealt either with TRW or Security, but never both, during the alleged co-trusteeship defeats any claim of a co-trusteeship. So TRW and Security were never co-trustees—and TRW has no right of indemnity against Security. *Cf. Fidelity Nat'l Title Ins. Co. v. Chicago Title Ins. Co.*, 64 F.3d 656 (4th Cir.1995).

For these reasons, we AFFIRM the judgment of the district court.