# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-2335

FIDELITY NATIONAL TITLE INSURANCE
COMPANY OF NEW YORK,

*Plaintiff-Appellant,*

*v.*

INTERCOUNTY NATIONAL TITLE
INSURANCE COMPANY, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 00 C 5658—**Samuel Der-Yeghiayan**, *Judge.*

_____

ARGUED APRIL 11, 2005—DECIDED JUNE 17, 2005

_____

Before POSNER, RIPPLE, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff in this complicated commercial case, which is in the federal courts under the diversity jurisdiction, lost a jury trial and appeals, complaining about three pretrial rulings, all procedural.

In a typical house purchase, involving a mortgage and title insurance, the mortgage lender places the money for

the loan in an escrow account administered by an escrow agent and insured by a title insurance company. A title insurance company named Intercounty National Title Insurance Company (INTIC) reinsured escrow accounts that it had insured with the plaintiff, Fidelity. As a result of fraud by INTIC's owners and employees, $46 million disappeared from INTIC's insured escrow accounts and Fidelity ended up having to pay more than $36 million to persons and firms having claims to money in those accounts. Fidelity brought the present suit against INTIC, the principals of INTIC, and various entities and individuals connected with INTIC to recover as much as it could of that amount. Fidelity named as additional defendants another title insurance company, Stewart Title Guaranty Company (STG), together with firms and individuals affiliated with STG that we can ignore.

Fidelity alleged that between 1995 and 2000 INTIC's escrow agent, Intercounty Title Company ("New Intercounty"), which was controlled by INTIC's principals, had transferred millions of dollars stolen from the escrow accounts to another escrow agent controlled by INTIC's principals, "Old Intercounty," whose escrow accounts were reinsured by STG rather than by Fidelity. Although INTIC's principals looted the escrow accounts reinsured by STG (a predecessor of INTIC) as well as those reinsured by Fidelity, the diversion of funds from New Intercounty's escrow accounts, reinsured by Fidelity, to Old Intercounty's escrow accounts, reinsured by STG, had (Fidelity argued) unjustly enriched STG at the expense of Fidelity. Fidelity's theory was that STG hadn't had to make good the losses in Old Intercounty's escrow accounts because those accounts had been refilled with money looted from the escrow accounts reinsured by Fidelity. Thus, but for the diversion of funds, STG would have had more liability to the victims of the thefts and Fidelity less.

Even if STG was not a party to the fraud, if it received the proceeds of the fraud it could indeed be liable to Fidelity (in Fidelity's capacity as subrogee of the escrow account holders whose losses it had had to cover) under the doctrine of unjust enrichment. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672, 678-79 (Ill. 1989); *State Farm General Ins. Co. v. Stewart*, 681 N.E.2d 625, 633-34 (Ill. App. 1997); compare *TRW Title Ins. Co. v. Security Union Title Ins. Co.*, 153 F.3d 822, 828-29 (7th Cir. 1998). That was the theory—the only theory—under which the case against STG went to the jury. Although Fidelity had also charged STG with being a party to the fraud, rather than being just a beneficiary of it, the district court had dismissed the fraud charge before trial on the ground that Fidelity had failed to plead it with the particularity required by Fed. R. Civ. P. 9(b). We begin our analysis with that ruling.

What is required in the way of particularity in pleading fraud depends on the purpose of imposing such a heightened requirement of pleading—so at odds with the notice-pleading theory of the federal rules. The purpose is to minimize the extortionate impact that a baseless claim of fraud can have on a firm or an individual. In the typical commercial case there is a substantial interval between the filing of the complaint and the completion of enough pretrial discovery to enable the preparation and disposition of a motion by the defendant for summary judgment. Throughout that period a claim of fraud will stand unrefuted, placing what may be undue pressure on the defendant to settle the case in order to lift the cloud on its reputation. The requirement that fraud be pleaded with particularity compels the plaintiff to provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless. It also forces the plaintiff to conduct a careful pretrial investigation and thus operates as a screen

against spurious fraud claims. *Ackerman v. Northwestern Mutual Life Ins. Co.*, 172 F.3d 467, 469-70 (7th Cir. 1999); *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992); *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 921 (4th Cir. 2003); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1296, p. 31 (3d ed. 2004).

Fidelity's 52-page complaint with its 177 numbered paragraphs is sprawling, confusing, redundant—in short a mess. And a district judge has the authority to dismiss a complaint because it is confusing, though only in a rare case would he be justified in dismissing it on this ground with prejudice, *Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir. 2003); *In re Westinghouse Securities Litigation*, 90 F.3d 696, 703-04 (3d Cir. 1996); *Simmons v. Abruzzo*, 49 F.3d 83, 86-87 (2d Cir. 1995); 5 Wright & Miller, *supra*, § 1281, pp. 708-12, thus barring the filing of an amended complaint. The fact that Rule 12(e) of the civil rules authorizes the granting of a defendant's motion for a more definite statement indicates that a confusing pleading is not ordinarily a fatal defect. But it can become one if despite repeated attempts the plaintiff is unable to draft an intelligible complaint. *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376, 378-79 (7th Cir. 2003); *Michaelis v. Nebraska State Bar Ass'n*, 717 F.2d 437 (8th Cir. 1983) (per curiam).

The district court did not purport to dismiss the complaint on this ground. Nor does STG urge it as an alternative basis for upholding the ruling. The court thought that STG couldn't figure out from the complaint the what, where, and when of the fraud charge against it. *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *Rodi v. Southern New England School of*

*Law*, 389 F.3d 5, 15 (1st Cir. 2004). But it could. All the acts alleged to constitute fraud by STG are set forth, with dates, in the complaint; no more was required.

The complaint was confusing because of such paragraphs as 111, which states that "as described above, at all relevant times, defendants [ten are then listed, including "Stewart," which denotes STG and its affiliates] were aware of significant deficiencies in the escrow accounts of Old Intercounty and New Intercounty, as well as the reasons therefor." The "relevant times" can be found elsewhere in the complaint and it is clear that the "reasons" for the "significant deficiencies" include fraud; the next paragraph, 112, alleges that "these defendants failed to disclose and fraudulently concealed said deficiencies from . . . Fidelity." The particulars of the charge of fraud would be easier to grasp if the acts, the times, the concealment, and a single defendant were placed in a single paragraph. But as long as those data are somewhere in the complaint—and they are—Rule 9(b) is satisfied. See *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252-53 (10th Cir. 1997); *Cramer v. General Telephone & Electronics Corp.*, 582 F.2d 259, 273 (3d Cir. 1978). The complaint may still be vulnerable to a charge of being intolerably confusing; but, as we said, this is not contended. It thus was error to dismiss the fraud claim against STG.

A more difficult issue concerns the judge's ruling excluding Fidelity's only expert witness from testifying. William Pollard, a forensic accountant employed by Deloitte & Touche, conducted a detailed investigation into the fraud. In the course of the investigation he interviewed a number of persons accused of having participated in the fraud, including employees of Old Intercounty. Pollard, or others on the investigative team, destroyed (more precisely, as we are about to see, thought they had destroyed) most of the

notes they'd taken of these interviews (and so did not turn them over to STG), on the ground that the notes did not "support" Pollard's expert opinion. By this was meant, however, not that they contradicted the opinion he planned to offer (that STG had benefited from the fraud because money obtained by the defrauders from accounts insured by Fidelity had been used to replenish Old Intercounty's escrow account, which STG had reinsured, thus reducing the losses that STG had had to cover) but that they were irrelevant to that opinion.

By the time it learned that it wouldn't be getting the notes, STG couldn't interview these individuals itself. They had been willing to talk to Pollard, but later, facing criminal prosecution, they refused on Fifth Amendment grounds to be interviewed further.

Most of the notes, it turned out, had not been destroyed. An almost complete set turned up in a related litigation. The notes revealed that one of Old Intercounty's employees had fabricated documents with the intention of concealing the fraud from STG. The notes may have contained other material as well that STG could have used in cross-examining Pollard had the latter been permitted to testify. For they indicated that one of the transactions that Pollard had described as a sham in his report (a transfer of looted funds) was legitimate; if so, this meant that some of the losses in the escrow accounts occurred while the accounts were indeed reinsured by Fidelity rather than by STG.

A litigant is required to disclose to his opponent any information "considered" by the litigant's testifying expert, Fed. R. Civ. P. 26(a)(2)(B); *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 785-86 (7th Cir. 2000); *Salgado ex rel. Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n. 6 (7th Cir. 1998); *In re Pioneer Hi-Bred Int'l, Inc.*, 238 F.3d 1370, 1375-76 (Fed. Cir. 2001), and the sanction for violating

this rule can include barring the expert from testifying. Fed. R. Civ. P. 37(c)(1); *Mems v. City of St. Paul, Department of Fire & Safety Services*, 327 F.3d 771, 779-80 (8th Cir. 2003); *Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 248 F.3d 29, 34-36 (1st Cir. 2001). Fidelity's contention that because Pollard's exclusion doomed its case, and was therefore "outcome determinative," state rather than federal law governs the issue is frivolous. The Federal Rules of Civil Procedure, not state procedural rules, govern in diversity, as they do in federal-question, cases in federal district courts. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 n. 7 (1996); *Hanna v. Plumer*, 380 U.S. 460, 469-74 (1965); *Houben v. Telular Corp.*, 309 F.3d 1028, 1039-40 (7th Cir. 2002).

Fidelity's further argument that because the notes were discarded pursuant to Deloitte's "document retention" (i.e., document destruction) policy, there was no violation of Rule 26, is also frivolous. There is nothing wrong with a policy of destroying documents after the point is reached at which there is no good business reason to retain them. Cf. *Arthur Andersen LLP v. United States*, 2005 WL 1262915, at *5 (U.S. May 31, 2005). Without such a policy a firm or an individual could drown in paper. There is no legal duty to be a pack rat. But a firm's document-retention policy cannot trump Rule 26(a)(2)(B). The rule does not require merely that the party disclose data that it happens to have retained; it must disclose all the data that an expert that it retained to testify at trial "considered," implying that it must retain those data, as otherwise it could not disclose them. *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 288-89 (E.D. Va. 2001). A testifying expert must disclose and therefore retain whatever materials are given him to review in preparing his testimony, even if in the end he does not rely on them in formulating his expert opinion, because such materials often

contain effective ammunition for cross-examination. Committee Notes to 1993 Amendments to Fed. R. Civ. P. 26(a)(2); *Karn v. Ingersoll-Rand Co.*, 168 F.R.D. 633 (N.D. Ind. 1996).

But he is not required to retain every scrap of paper that he created in the course of his preparation—only documents that would be helpful to an understanding of his expert testimony or that the opposing party might use in cross-examination. See Committee Notes, *supra*. Fidelity argues that the interview notes could not have been used for *any* purpose by STG in this lawsuit because STG's knowledge or lack thereof of the fraud was irrelevant to the claim of unjust enrichment. It's not true, however, that knowledge is irrelevant to unjust enrichment. Obviously it could affect a claim for punitive damages, see *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 757 (Ill. 1994); *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 817 N.E.2d 1230, 1262 (Ill. App. 2004); 1 Dan B. Dobbs, *Law of Remedies* § 3.11(2), p. 468 (2d ed. 1993), though they were not sought in this case. But it could affect the determination of liability as well. A recipient of proceeds of fraud can be deemed unjustly enriched by them and forced to cough them up even if he is ignorant of their tainted source, *Smithberg v. Illinois Municipal Retirement Fund*, 735 N.E.2d 560, 565-66 (Ill. 2000); *Norton v. City of Chicago*, 690 N.E.2d 119, 126 (Ill. App. 1997); *Selmaville Community Consolidated School District No. 10 v. Salem Elementary School District No. 111*, 421 N.E.2d 1087, 1090-91 (Ill. App. 1981); *Restatement of Restitution* § 13 (1937), but if he had when he received them a reasonable belief that he was entitled to them, and if he would suffer a large loss if forced to give them back (that is, if he relied to his detriment on what he reasonably believed to be his right to the money), the court, balancing the equities, can excuse him from having to repay. *Bryan v. Citizens Nat'l Bank*, 628

S.W.2d 761, 763 (Tex. 1982); *Amalgamated Ass'n of Street Electric Railway & Motor Coach Employees of America v. Danielson*, 128 N.W.2d 9, 10-11 (Wis. 1964); 28 Richard A. Lord, *Williston on Contracts* § 70:200 (4th ed. 2004); *Restatement of Restitution*, *supra*, § 69. So if the fraudsters deceived STG into thinking that the replenishment of the Old Intercounty escrow account and resulting benefit to STG was on the up and up, this could help STG escape liability.

Fidelity's remaining argument against the exclusion of Pollard is its strongest: that the sanction for the nondisclosure of the interview notes was too severe. In admeasuring sanctions for violating the rules of pretrial discovery, as in other areas of the law, the punishment should fit the crime. *Rice v. City of Chicago*, 333 F.3d 780, 784 (7th Cir. 2003); *Melendez v. Illinois Bell Telephone Co.*, 79 F.3d 661, 672 (7th Cir. 1996); *Bonds v. District of Columbia*, 93 F.3d 801, 807-09 (D.C. Cir. 1996); see also *Doe v. Cassel*, 403 F.3d 986, 990 (8th Cir. 2005) (per curiam). This is apparent from the breadth of the range of sanctions that the civil rules authorize for failure to disclose materials on which an expert's opinion is based. See Fed. R. Civ. P. 37(c)(1), incorporating by reference the list of sanctions in Fed. R. Civ. P. 37(b)(2)(A)-(C).

The punishment was excessive because the judge had already, on another ground, ruled that Pollard could not testify concerning STG's knowledge of the fraud. Pollard should have been allowed to give testimony in which he would merely have traced the money from the fraud to Old Intercounty's escrow account and demonstrated how that movement of funds had benefited STG by reducing its insurance liability. The interview notes would have borne only peripherally on that issue. And although as we noted earlier the complete interview notes might have enabled STG to show that some of the losses in the escrow accounts occurred while they were insured by Fidelity rather than by

STG, STG thinks so little of the point as barely to hint at it in its brief in this court. The reason may be that, as far as we can determine, the set of interview notes that surfaced in the other litigation was *almost* complete; and since those notes were available to STG nearly three months before the trial in this case, the prejudice to STG from the delay in disclosure was minimal.

Any (slight) harm to STG caused by Fidelity's violation of Rule 26 could have been fully compensated by the judge's granting STG a continuance to enable it to conduct any additional discovery that might have been warranted by information revealed by the interview notes and requiring Fidelity to reimburse STG for the expense of such additional discovery and for any other litigation expenses caused by Fidelity's failure to make timely and complete disclosure of the notes. Fed. R. Civ. P. 37(c)(1).

The judge did not mention Rule 37, however, and maybe therefore we should consider him to have been exercising his "inherent" power to control the course of the litigation rather than applying the civil rules. By this is meant only that a judge's power includes not only what he is expressly empowered to do but also such ancillary powers as are necessary and proper to his exercise of the explicitly conferred ones. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *United States v. Hudson*, 7 Cranch (11 U.S.) 32, 34 (1812); *G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 651-52 (7th Cir. 1989) (en banc); *United States v. Kouri-Perez*, 187 F.3d 1, 7 (1st Cir. 1999). But when a domain of judicial action is covered by an express rule, such as Rules 26 and 37 of the civil rules, the judge will rarely have need or justification for invoking his inherent power. *Chambers v. NASCO, Inc.*, *supra*, 501 U.S. at 50; *Zapata Hermanos Sucesores, S.A. v. Hearthside Banking Co.*, 313 F.3d 385, 391-92 (7th Cir. 2002); *Kovilic Construction Co. v. Missbrenner*, 106 F.3d 768, 772-73 (7th Cir. 1997). He

did not here.

STG argues that even if the judge's bar against Pollard's testifying was erroneous, the error was harmless because other Fidelity witnesses testified to the money flows. Cf. *Hill v. Porter Memorial Hospital*, 90 F.3d 220, 224 (7th Cir. 1996). But given the complexity of the case, the exclusion of the only witness who could have tied up the loose ends and presented a compact and coherent account cannot be deemed harmless. See *Johnson v. United States*, 780 F.2d 902, 906 (11th Cir. 1986); cf. *Roback v. V.I.P. Transporation, Inc.*, 90 F.3d 1207, 1216 (7th Cir. 1996).

The final issue concerns the judge's refusal to allow Fidelity to present summaries, which it furnished to STG only 30 days before the start of trial, of the hundreds of thousands of pages of contracts that it believed demonstrated how STG had been enriched by the fraud. The judge gave two grounds for his action. First, he said that "a court should be wary lest a party use a summary as an opportunity to argue its view of the evidence or to misstate the evidence causing the jury to misconstrue the evidence," and therefore "we do not find that the usage [*sic*] of summaries were [*sic*] warranted in this instance." Second, the judge thought 30 days before trial too little time to enable STG's counsel to review the summaries. The first ground was unreasoned, and the second incorrect. Rule 1006 of the Federal Rules of Evidence, which makes summaries of "voluminous writings" admissible at trial, does not express any "wariness" concerning the legitimacy of summaries; the fact that they *might* be inaccurate is not a ground for excluding them without any determination of whether they are inaccurate. Fidelity submitted several affidavits, which STG did not contest in the district court, that purported to demonstrate the accuracy of the summaries. *United States v. Robinson*, 774 F.2d 261, 276 (8th Cir. 1985); *State Office*

*Systems, Inc. v. Olivetti Corp. of America*, 762 F.2d 843, 845 (10th Cir. 1985); *United States v. Behrens*, 689 F.2d 154, 161 (10th Cir. 1982).

As for the summaries being untimely, Rule 1006 requires only that the summarized documents be made available to the opposing party at a "reasonable time"; it does not say when the summaries must be made available to the party—for that matter, it nowhere states that the *summaries* must be made available to the opposing party. *Coates v. Johnson & Johnson*, 756 F.2d 524, 550 (7th Cir. 1985). No federal rule is needed, however, to empower a district judge to prevent a party from springing summaries of thousands of documents on the opposing party so late in the day that the party can't check their accuracy against the summarized documents before trial. *Air Safety, Inc. v. Roman Catholic Archbishop of Boston*, 94 F.3d 1, 8 (1st Cir. 1996); 31 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 8045, pp. 548-50 (2000); see *Canada Dry Corp. v. Nehi Beverage Co.*, 723 F.2d 512, 523 (7th Cir. 1983); *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir. 1985). (So here is a good example of the inherent power of a district judge to control the course of litigation.) But Sidley Austin Brown & Wood, STG's counsel, is a huge law firm that could easily have spot checked the summaries for accuracy immediately upon receiving them 30 days before the trial began, and if the check had revealed inaccuracies STG would then have had solid grounds for moving to exclude them from the trial unless the inaccuracies were promptly corrected. See *Needham v. White Laboratories, Inc.*, 639 F.2d 394, 403 (7th Cir. 1981). By failing to employ this simple expedient STG forfeited any claim of untimeliness.

We are not certain how badly Fidelity was hurt by the exclusion of the summaries. But since there must be a new trial because of the exclusion of Pollard's testimony, the

issue of harmless error in the exclusion of the summaries is academic; STG will have plenty of time to check their accuracy. STG also argues that some of the summarized documents should be ruled inadmissible, which if correct would obviously affect the accuracy of the summaries, *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1044-45 (7th Cir. 1990), but that too is an issue for the remand.

REVERSED AND REMANDED.

A true Copy:

       Teste:

                            _____
                            *Clerk of the United States Court of*
                              *Appeals for the Seventh Circuit*